UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MOMS FOR LIBERTY – BREVARD COUNTY, FL, et. al, <br><br> *Plaintiffs*, <br><br> v. <br><br> BREVARD PUBLIC SCHOOLS, et. al, <br><br> *Defendants*. | Case No. 6:21-cv-1849-RBD-GJK <br><br> PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS |

Plaintiffs submit this Response to Defendants' Motion to Dismiss.

A. THE COURT LACKS JURISDICTION AT THIS TIME TO DISMISS PLAINTIFFS' CONSTITUTIONAL CLAIMS.

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) (internal quotation marks omitted). Because Plaintiffs have appealed from the Court's denial of their motion for a preliminary injunction, the merits of Plaintiffs' constitutional claims—disputed in that motion—are, for the time being, within the Eleventh Circuit's exclusive jurisdiction. *See Barr v. One Touch Direct, LLC*, No. 15-cv-2391, 2017 U.S. Dist. LEXIS 44989, *5

- 1 -

(M.D. Fla. Mar. 28, 2017) (plaintiff filed interlocutory appeals after defendants moved to dismiss, thus, the district court "deferred ruling" on the motions until "jurisdiction reinvested" in it from the Circuit Court).

That includes the question of whether the Complaint gives Defendants fair notice of the claims against them, which is encompassed by the question of whether Plaintiffs have established a likelihood of success on the merits. Moreover, if this Court finds the Complaint is a "shotgun pleading," it "must" afford Plaintiffs an opportunity to replead, *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018)—but leave to amend must await the appeal's conclusion, as "[a] district court does not have the power to alter the status of the case as it rests before the Court of Appeals." *Green Leaf*, 341 F.3d at 1309 (internal quotation marks omitted). Without waiving any of these arguments, Plaintiffs will nonetheless substantively address all of Defendants' claims.

B. The Complaint gives fair notice of Plaintiffs' claims.

Defendants err in claiming that the Complaint is a "shotgun pleading." "In general, a shotgun pleading fails to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests. This is not the case with [Plaintiffs'] Complaint, which, …, sufficiently puts Defendants on notice of the claims against them." *Wyndham Vacation Ownership, Inc. v. Clapp Bus. Law, LLC*, 411 F. Supp. 3d 1310, 1316 (M.D.

Fla. 2019) (internal quotation marks and citation omitted). Indeed, it offers "specific factual allegation[s] [that] informs the reader how, precisely," the Defendants violated Plaintiffs' First Amendment rights. *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014). Not every complaint that utilizes the reincorporation of allegations is, for that reason, a "shotgun pleading." Here, "[t]he task of figuring out which" factual allegation "incorporated into [each] count [is] relevant to [Plaintiffs' constitutional claims] is hardly a task at all." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1324-25 (11th Cir. 2015).

It is proper to reallege the allegations in the complaint for each count and to allege that all Defendants are responsible for Plaintiffs' injuries when, as here, Plaintiffs allege that Defendants are acting in concert to inflict Plaintiffs' injuries and "all of the facts [are] related to the" constitutional violations. *Wyndham Vacation Ownership*, 411 F. Supp. 3d at 1316. Defendants must be named in all counts since they are the government authorities "designated to enforce" the unconstitutional Policy, "even [if] that party has made no attempt to enforce the rule." *Am. Civil Liberties Union v. The Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993). Complaint introductions, which help clarify matters, are common. Plaintiffs mention the criminal statute only in explaining Defendants' speech-chilling prosecutorial threats.

- 3 -

Compl. (Doc. 1) ¶ 42, 49-50. Defendants cite no authority barring mention of their Policy amendments.

Defendants may dislike and disagree with the complaint, but it gives them fair notice of the claims against them.

C. PLAINTIFFS HAVE STANDING TO RAISE AN OVERBREADTH CHALLENGE.

Defendants' claim that Plaintiffs lack standing to seek relief for others, Defs.' Mot. to Dismiss (Doc. 41) ("Mot."), 4, is misplaced. It is well-established that Plaintiffs can raise a First Amendment overbreadth claim implicating others' rights when the regulation's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957 (1984). Plaintiffs do not represent third parties just by pointing out their mistreatment by Defendants. That the public benefits from Plaintiffs' efforts does not diminish their standing.

D. MOMS FOR LIBERTY – BREVARD COUNTY, FL HAS STANDING

Defendants chide Plaintiff Moms for Liberty – Brevard County, FL ("M4L") for "fail[ing] to allege that it, individually, ever attempted to speak at a Board meeting or that it has any intent to do so." Mot. at 6. But M4L is an organization, not an individual. It can only speak through individuals, such as its Chair, Plaintiff Hall, and its members, including Plaintiffs Cholewa, Delaney, and Kneessy—and the complaint spells out M4L's encouragement of

- 4 -

its members to identify with it while speaking at board meetings, and acknowledging that their speech reflects on it. Complaint, ¶ 22 (item 4). That restricting the speech of M4L's Chair and members when they express themselves as such, would impact M4L's ability to express itself, is obvious.

With respect to M4L's standing to represent its members, Defendants do not question that M4L satisfies two of the three associational standing prongs, *see Hunt v. Wash. States Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)—that its members otherwise have standing to sue, and that the interest in free speech before the school board is germane to M4L's purpose. Defendants question only the third prong, arguing that "the nature of the claim or relief sought is not common to all members of the association or shared in equal degree, such that 'both the fact and extent of injury would require individualized proof.'" Mot. at 7 (quoting *Doe v. Sch. Bd. for Santa Rosa Cty.*, 264 F.R.D. 670, 688 (N.D. Fla. 2010)) (other citation omitted). But they omit what follows: "An exception exists where an association's claims do not require the consideration of individual circumstances but present only a pure question of law." *Doe*, 264 F.R.D. at 688 (citation omitted).

That is the case here. The impact on all of M4L's members is the same: they are all frustrated in their ability to speak by the policies and practices whose constitutionality—a pure question of law—they dispute. But Defendants go yet further, claiming that associational standing is

unavailable because "[a] claim that First Amendment rights were violated or chilled is 'highly dependent on a showing of individual and particularized factual circumstances . . . ." Mot. at 7 (quoting *Doe*, 264 F.R.D. at 688).

This is not the law. Courts routinely affirm associational standing in First Amendment cases. *See, e.g.*, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Fla. State Conf. of the NAACP v. Lee*, No. 4:21cv187, 2021 U.S. Dist. LEXIS 245347, at *13 (N.D. Fla. Dec. 17, 2021). *Doe* does not suggest otherwise. There, the court denied an association's motion to intervene on grounds that a consent decree would impact its members' rights. It held that the members' injury claims were "based on a misunderstanding and an isolated reading of selected portions of the [decree]," *Doe*, 264 F.R.D. at 681, and that their claims were "objectively unreasonable," *id.* at 685. The associational standing claim failed at the first prong—and discussion of the third prong was optional dictum. *Id.* at 687. With respect to the third prong, testimony showed that the consent decree impacted the association's members differently. *Id.* at 675-77, 688. *Doe* did *not*, as Defendants claim, assert that "[a] claim that First Amendment rights were violated or chilled" fails the third prong, Mot. at 7; Doe held that "[t]he nature of any claim *that the consent decree*"—the decree at issue in *Doe*—"in fact chills private First Amendment free speech rights is highly dependent" on individualized circumstances. *Doe*, 264 F.R.D. at 688 (emphasis added).

This case does not concern the *Doe* consent decree. It concerns Defendants' speech policies and practices, which are plainly subject to challenge by an association of people that those policies and practices impact.

E.  PLAINTIFFS CAN CLAIM THE POLICY "CHILLS" THEIR SPEECH

Plaintiffs sufficiently allege that the Policy "chills" their constitutionally speech. "Threats of arrest for engaging in free speech activities are evidence of 'an actual and concrete injury wholly adequate to satisfy the injury in fact requirement of standing.'" *Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1219 (M.D. Fla. 2020) (quoting *Bischoff v. Osceola* Cty., 222 F.3d 874, 884 (11th Cir. 2000)). Indeed, the injury requirement for standing is relaxed in First Amendment challenges "'in order to provide broad protection for speech.'" *Doe*, 264 F.R.D. at 680 (quoting *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009)).

"A chilling effect that results in self-censorship may satisfy the actual injury requirement of standing where the self-censorship is engaged in to avoid a real threat of enforcement consequences." *Id.* (citing *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001)). A plaintiff's "'subjective fear that she may be prosecuted for engaging in expressive activity'" is "'an injury for standing purposes [if] that fear is objectively reasonable.'" *Id.* (quoting *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)). "Thus, in this case, where the alleged injury is one of self-censorship, the likelihood of [negative

consequences] by the School Board [is an] important factor[ ] in determining whether the individual reasonably believed it was necessary to forego what she considered to be constitutionally protected speech in order to avoid negative action." *Id*. "Where this belief is objectively unreasonable, there is no demonstration of an imminent threat of actual injury." *Id*.

Here, the Complaint cites numerous examples of Defendants using the Policy to engage in viewpoint discrimination, including against Plaintiffs' speech, such that Plaintiffs have an objectively reasonable belief that they will continue to suffer under the Policy. Plaintiffs also have a reasonable fear of criminal prosecution for "disrupting" the Defendants' meetings under § 877.13, Fla. Stat. After all, Defendants admit that the Policy's purpose is to prevent meeting "disruption." Mot. at 18, 19, 21, 22. It is irrelevant that no one has been prosecuted yet. "The whim, self restraint, or even the well reasoned judgment of a government official cannot serve as the lone safeguard for First Amendment rights." *Fla. Cannabis Action Network, Inc. v. City of Jacksonville*, 130 F. Supp. 2d 1358, 1362 (M.D. Fla. 2001). Each time the Policy is enforced to censor or discriminate against the views of someone, that person risks criminal prosecution for "disrupting" the meeting.

Indeed, even short of actual prosecution, the repeatedly-realized threat of censorship, termination, and ejection is sufficient to deter speech. People attend school board meetings to speak, to be heard, to participate in civic

discourse—not to get shouted down and thrown out. That Defendants'
practices weigh on Plaintiffs' choice of words and sometimes deter them from
bothering altogether are First Amendment injuries.

F.  DEFENDANT BOARD MEMBERS CAN BE SUED IN THEIR OFFICIAL CAPACITIES,
BUT THEY MAY BE DISMISSED TO THE EXTENT BREVARD PUBLIC SCHOOLS
CONCEDES THAT IT IS A PROPER DEFENDANT.

Defendant Board Members' argument that the official capacity claims
against them are "redundant" of the claims against Defendant Brevard
Public Schools ("BPS"), Mot. at 9, and that thus no "need" exists for the
official capacity claims, *id.* at 10, is well-taken—if BPS thereby admits that it
is a proper defendant. But that is unclear, as elsewhere BPS misconstrues
the claims against it as seeking vicarious liability.

G.  DEFENDANTS SUSIN, CAMPBELL, MCDOUGALL, AND JENKINS ARE LIABLE

All Defendants are properly named. The "presiding officer" enforces the
Policy at meetings. *See* the Policy. Under school board bylaws, Defendants
Susin, Campbell, McDougall, or Jenkins could "be designated" the presiding
officer at a school board meeting. Presiding Officer, Brevard Sch. Bd. Policy
Manual § 0000 Bylaws, Code po0163. Because they are government officials
that can be "designated to enforce" the Policy, "even [if they have] made no
[prior] attempt to enforce the rule," *Am. Civil Liberties Union*, 999 F.2d at
1490, they are proper defendants in this lawsuit.

H. Defendants Have Not Established Qualified Immunity

Defendants argue qualified immunity shields them because a speaker's right to be free from viewpoint discrimination at a government meeting is not "clearly established." Mot. at 12 (citing *Dayton v. Brechnitz*, No. 20-cv-307, 2021 U.S. Dist. LEXIS 214328, *17-*19 (M.D. Fla. Nov. 5, 2021)). But the *Dayton* court made that decision at the summary judgment stage. *Id.* at *1. At the motion to dismiss stage, the court ruled the defendant was *not* entitled to qualified immunity "[g]iven the plausible violation of a clearly established constitutional right." *Dayton v. City of Marco Island*, No. 20-cv-307, 2020 U.S. Dist. LEXIS 91417, at *9 (M.D. Fla. May 26, 2020).

Likewise, Plaintiffs' Complaint demonstrates Defendants discriminate against their viewpoints, and, therefore, violate Plaintiffs' clearly established First Amendment rights. "The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis." *Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989). "Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place." *Holloman v. Harland*, 370 F.3d 1252, 1280 (11th Cir. 2004). Here, the Complaint shows Plaintiffs and other members of the public that criticize the Defendants' policies are regularly chastised, criticized, or silenced at school board meetings, but the Defendants' supporters are almost always allowed to

speak uninterrupted. At this point, the Court must accept these allegations of obvious viewpoint discrimination "as true" and view them "in the light most favorable to [P]laintiff[s]," *Amegy Bank Nat'l Ass'n v. Deutsche Bank Corp.*, 917 F. Supp. 2d 1228, 1232 (M.D. Fla. 2013), precluding qualified immunity.

## I.   BREVARD PUBLIC SCHOOLS IS LIABLE

"When suing a corporate entity under § 1983, a plaintiff must show that the entity itself committed or caused the constitutional violation." *Harper v. Prof'l Prob. Servs.*, 976 F.3d 1236, 1244 n.10 (11th Cir. 2020). Plaintiffs "must demonstrate that the unconstitutional actions of [Brevard Public Schools] were taken pursuant to a 'policy or custom . . . made . . . by those whose edicts or acts may fairly be said to represent official policy.'" *Id*. (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

"At the motion-to-dismiss stage, the [P]laintiffs have alleged a sufficient basis to conclude that [BPS]'s 'policy or custom' caused their injuries." *Id*. Here, Plaintiffs allege BPS's unconstitutional actions were taken pursuant to official policy. *See* Compl. ¶¶ 15-19, 23-24, 28-34, 38-40, 43-47, 49-81. Indeed, Plaintiffs suffered all but one of their First Amendment injuries that constitute the counts in the Complaint pursuant to the Policy. *Id*. And the egregious nature of the First Amendment violations listed in the Complaint, *id*., demonstrates the Policy's "deliberate indifference" to Plaintiffs' free speech rights. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Plaintiffs' "claim[s] [do not] rest[ ] upon one incident." *Id*. at 1291. Instead, Plaintiffs "identify [a] 'pattern of injuries' linked to the" Policy. *Id*.  Therefore, Plaintiffs have sufficiently pled a claim against BPS.

J.  THE POLICY IS FACIALLY UNCONSTITUTIONAL

As written, the Policy enables Defendants to discriminate against speaker viewpoints. Even in a limited public forum, "the First Amendment does not tolerate viewpoint-based discrimination against speech within the scope of the forum's subject matter." *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1225 n.10 (11th Cir. 2017). Viewpoint discrimination occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). It is presumptively unconstitutional. *Id*. at 830.

Defendants' argument that forbidding personally directed comments and requiring all individuals to direct their statements "to the Board Chair does not prohibit any speech whatsoever," and the Chair's power to "terminate" allegedly abusive speakers does "not ban[] any speech," Mot. at 17-18, would surprise the Plaintiffs and others described in the Complaint, who Defendants targeted under the Policy. The Complaint shows the Defendants interrupt speakers, bar speakers from expressing viewpoints, and eject speakers from meeting on account of their views under the pretext that their

speech is allegedly "abusive" or "personally directed." *See* Compl. ¶¶ 23-24, 28-34, 37-40, 43-47, 49-50.

Defendants discriminate against those espousing viewpoints critical of them and their policies under the auspices of the Policy's prohibition on "personally directed" or "abusive" speech. But it is "a bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017). Indeed, "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (quoting *Tam*, 137 S. Ct. at 1751). The Supreme Court has "said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Tam*, 137 S. Ct. at 1763 (op. of Alito, J.) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)) (adopted by the Court in *Brunetti*, 139 S. Ct. at 2301 (slip op., at 8)). Indeed, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Defendants argue the Policy just maintains meeting decorum to facilitate its business meetings and seem to assert that this is the highest value in limited public forum speech jurisprudence. Mot. at 17-19. But meeting

decorum is not an exception to the prohibition on viewpoint discrimination. "Listeners' reaction to speech is not a content-neutral basis for regulation," *Forsyth County. v. Nationalist Movement*, 505 U.S. 123, 134 (1992), or for censoring a peaceful speaker. *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) ("Participants in an orderly demonstration in a public place are not chargeable with the danger . . . that their critics might react with disorder or violence.").

It is undisputed that Defendants have an "interest in conducting orderly, efficient meetings." *Jones v. Heyman*, 888 F.2d 1328, 1332 (11th Cir. 1989). Plaintiffs object to the inevitable viewpoint discrimination the Policy produces. Despite the interest in meeting decorum, the Policy "cannot be saved by analyzing it as a type of government program in which some content- and speaker-based restrictions are permitted." *Tam*, 137 S. Ct. at 1763 (op. of Alito, J.) (adopted by the Court in *Brunetti*, 139 S. Ct. at 2301 (slip op., at 8)). "To be sure, the [Policy] evenhandedly prohibits disparagement of all groups," as written (if not as enforced). *Id*. "But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint." *Id*. Indeed, a prohibition on "offensive" speech reveals "facial viewpoint bias in [a] law [that] results in viewpoint-discriminatory application." *Brunetti*, 139 S.Ct. at 2300 (internal quotation marks omitted).

Defendants look to cases where courts ruled the public body's interest in maintaining meeting decorum overruled a speaker's interest in discussing off-topic issues or making defamatory statements, *i.e.*, expressing *un*protected speech. *See* Mot. at 18 (citing, *e.g.*, *Jones*, 888 F.2d at 1333 (speakers may be confined to specific subject matter); *Dyer v. Atlanta Indep. Sch. Sys.*, 852 F. App'x 397, 398-99 (11th Cir. 2021) (speaking policy that prohibited defamation prevented the plaintiff from defaming school board members with racial epithets); *Brown v. City of Jacksonville*, No. 3:06-cv-122, 2006 U.S. Dist. LEXIS 8162, *3-*4, *9 (M.D. Fla. Feb. 16, 2006) (speaker performed excessive theatrics in costume and failed to adhere to an agenda item under discussion). This line of reasoning is irrelevant here—none of Plaintiffs' claims concern censorship of aimless statements on non-agenda topics or unprotected speech. Plaintiffs' claims concern relevant speech that Defendants censor because of viewpoint.

The Policy's text shows that it disfavors allegedly "offensive" ideas by prohibiting so-called "abusive" "personally directed" speech. Because the Policy facially bans protected speech it is unconstitutional viewpoint discrimination. *Brunetti*, 139 S. Ct. at 2300-01; *Tam*, 137 S. Ct. at 1751, 1763.

K. THE POLICY IS UNCONSTITUTIONAL AS APPLIED

Defendants argue that since Plaintiffs and others sharing their views have spoken at Board meetings without interruption on several occasions, the

Policy is constitutional as applied because it is only enforced when Plaintiffs, and others sharing similar views, violate the Policy. Mot. at 20-23. Simply put, Defendants are admitting that sometimes they violate Plaintiffs' free speech rights and sometimes they do not. But all this argument does is prove the Policy is unworkable.

There is "danger in putting faith in Government representations of prosecutorial restraint." *United States v. Stevens*, 559 U.S. 460, 480 (2010). "The whim, self restraint, or even the well reasoned judgment of a government official cannot serve as the lone safeguard for First Amendment rights." *Fla. Cannabis Action Network*, 130 F. Supp. 2d at 1362. Indeed, "the First Amendment protects against the Government; it does not leave [Plaintiffs] at the mercy of *noblesse oblige*. [The Court should] not uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Stevens*, 559 U.S. at 480.

Defendants' reliance on *Dyer* is unpersuasive. Unlike the circumstances here, the *Dyer* speaking policy prohibited "speech that defames individuals or stymies or blocks meeting progress." *Dyer*, 426 F. Supp. 3d at 1360. It is undisputed that defamation is unprotected speech and time limitations that prevent speakers from stymieing or blocking meeting progress are lawful. And, as Defendants note, "Dyer himself" was only censored when he used "racial slurs," Mot. at 22, which are not at issue here. Indeed, Defendants' use

of the Policy to censor speakers as described in the Compliant is a far cry from the application of the *Dyer* speaking policy to suppress unprotected speech.

"Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in" the Defendants' application of the Policy and in their Motion to Dismiss. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Unlike the *Dyer* speaking policy's prohibition on unprotected speech, Defendants' Policy discriminates against protected viewpoints.

Defendants' application of the Policy reveals it disfavors ideas that offend when they interrupt, chastise, or silence speakers that express offensive statements. *See* Compl. ¶¶ 28-29, 32, 38, 43-47. Because Defendants use the Policy to ban offensive speech, and, thus, employ viewpoint discrimination, it is unconstitutional as applied. *See Brunetti*, 139 S. Ct. at 2301; *Tam*, 137 S. Ct. at 1751, 1763 (op. of Alito, J.) (adopted by the Court in *Brunetti*, 139 S. Ct. at 2301 (slip op., at 8)).

L.  THE POLICY IS OVERBROAD AND VOID FOR VAGUENESS

The Policy is unconstitutionally vague and overbroad. When a vague regulation encroaches on the exercise of "basic First Amendment freedoms," its "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly

marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal punctuation marks and citations omitted). The discretion of a meeting's presiding officer "must be guided by objective, workable standards. Without them [the official's] own politics may shape his views on what counts as [prohibited speech]." *Id.* The "'government may regulate in the area' of First Amendment freedoms 'only with narrow specificity.'" *Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

A regulation is overbroad when the government allows the "'scope'" of the rule "'to reach both unprotected expression as well as, at least potentially, protected speech.'" *Wacko's Too, Inc. v. City of Jacksonville*, 522 F. Supp. 3d 1132, 1159 (M.D. Fla. 2021) (quoting *American Booksellers v. Webb*, 919 F.2d 1493, 1502 (11th Cir. 1990)).

Here, the Policy is unconstitutionally vague and overbroad for the same reasons. It has no boundaries for its prohibitions on speech that is "abusive," "personally directed," or "obscene." The Policy provides no "objective, workable standards," but, instead, allows Defendants' "own politics" to shape their views on what is prohibited, creating viewpoint discrimination. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018).

Defendants claim the Policy "only" applies to "disruptive conduct" and "does not reach a substantial amount of constitutionally protected conduct."

Mot. at 23-24. Ordinarily, a ban on obscenity "will not potentially silence constitutionally protected speech." *Jones v. Key West*, 679 F. Supp. 1547, 1559 (S.D. Fla. 1988), *rev. on other grounds*, 888 F.2d at 1332. But it might at Defendants' meetings, given their idiosyncratic understanding of that concept. *See* Compl. ¶ 47 (library book incident).

Indeed, Plaintiffs have provided numerous examples of individuals that did nothing more than talk and the Chair deemed their constitutionally protected conduct was disruptive, leading to Policy enforcement. Compl. ¶¶ 24, 28-32, 34, 37-40, 43-47. None of their comments were "obscene," *see Miller v. California*, 413 U.S. 15, 20 (1973) (defining "obscenity" as speech "utterly without redeeming social importance"), or "personally abusive epithets … likely to provoke violent reaction," a.k.a., "'fighting words'" that can be regulated. *Cohen v. California*, 403 U.S. 15, 20 (1971). But the comments violated the Policy because Defendants deemed it so.

M. PLAINTIFFS' PREFERENTIAL ACCESS ALLEGATIONS PRESENT A VALID CLAIM

Plaintiffs allege "Defendants provided preferential access to a board meeting to people aligned with the Board's views on a BPS policy and consequently limited the access of some individuals with views that diverged from the Board," Compl. ¶ 23, including M4L members, Compl. ¶¶ 25, 26. Thus, "Defendants" denied Plaintiffs their free speech rights "[b]y extending preferential access to a school board meeting on the basis of viewpoint, and

thereby limiting Plaintiffs' access to that meeting and excluding them from that meeting on the basis of their viewpoints." Compl. ¶ 84.

Defendants go beyond the pleadings to chastise Plaintiffs for "fail[ing] to acknowledge" that "the president of the Trump Club," among others, created "hostile and unsafe conditions" that required "[s]ome people" be "escorted in to ensure their safety." Mot., Doc. 41, 25. This argument is better saved for summary judgment, or trial. At this stage, "the Court must accept all well pleaded factual allegations in [the] [C]omplaint as true and take them in the light most favorable to [P]laintiff[s]." *Amegy Bank*, 917 F. Supp. 2d at 1232. Discovery may reveal the orchestrator of the special escort that Defendants now admit occurred, and the reasons for it. But Defendants controlled access to the meeting room, and are responsible for what happened—whether or not the incident was as innocent as they prematurely claim.

CONCLUSION

Defendants' Motion should be denied.

Dated: January 31, 2022           Respectfully submitted,
                                  /s/ Ryan Morrison
                                  _____
David Osborne                     Ryan Morrison (*pro hac vice*)
GOLDSTEIN LAW PARTNERS, LLC       Martha Astor (*pro hac vice*)
4651 Salisbury Rd., Suite 400     INSTITUTE FOR FREE SPEECH
Jacksonville, FL  32256           1150 Connecticut Ave., NW, Suite 801
610-949-0444                      Washington, DC  20036
dosborne@goldsteinlp.com          202-301-3300
                                  rmorrison@ifs.org
                                  astorm@ifs.org
*Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I certify that on January 31, 2022, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system.

/s/ Ryan Morrison
Ryan Morrison (*pro hac vice*)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, DC  20036
202-301-3300
rmorrison@ifs.org
*Lead Counsel for Plaintiffs*