## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

MOMS FOR LIBERTY –
BREVARD COUNTY, FL,  et al.

      Plaintiffs,                  CASE NO.: 6:21-cv-1849-RBD-GJK

vs.

BREVARD PUBLIC SCHOOLS, et al.,

      Defendants.

_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants, Brevard Public Schools ("BPS") and Misty Haggard-Belford ("Belford" or "Chair") (collectively, "Defendants"), pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 3.01(a), hereby move for entry of summary judgment against Plaintiffs, Moms for Liberty – Brevard County, FL ("MFL"), Ashley Hall ("Hall"), Amy Kneessy ("Kneessy"), Katie Delaney ("Delaney"), and Joseph Cholewa ("Cholewa") (collectively, "Plaintiffs"), and state:

### Introduction and Requested Relief

There is no genuine dispute of material fact regarding Defendants' constitutional application of BPS' Public Participation Policy ("Policy") to public comments at BPS school board meetings. The evidence demonstrates that Defendants apply the Policy, which is content- and viewpoint-neutral, in a non-discriminatory manner. In addition, Plaintiffs lack standing to bring

their claims because they cannot demonstrate an objectively reasonable fear of prosecution for violating the Policy. For these reasons, the Court should enter summary judgment in favor of Defendants and against Plaintiffs.

## Procedural History

1.      Plaintiffs filed this § 1983 action on November 5, 2021 (Doc. 1) and moved for entry of a preliminary injunction (Doc. 3.)

2.      In the initial Complaint, Plaintiffs sued BPS, as well as Belford and Board members Katye Campbell, Matt Susin, Cheryl McDougall, and Jennifer Jenkins in their official and individual capacities. Plaintiffs alleged that the Policy was unconstitutional on its face and as applied, vague, and overbroad; Defendants violated Plaintiffs' rights of free speech and freedom to petition the government for redress; and Defendants provided favored access to pro-LGBTQ+ speakers at a March 9, 2021 Board meeting and thereby prevented Cholewa from speaking at the meeting. (*See* Doc. 1.)

3.      Plaintiffs based their Motion for Preliminary Injunction on the same allegations as the Complaint and included declarations by the Plaintiffs as exhibits. (*See* Doc. 3.) Plaintiffs sought a preliminary injunction precluding Defendants from utilizing the Policy at Board meetings.

4.      Both the Complaint and the Motion for Preliminary Injunction described Board meetings that occurred from January 19, 2021 through October 26, 2021. (*See* Docs. 1 & 3.)

5.     Defendants responded to the Motion for Preliminary Injunction on November 29, 2021 (Doc. 19) and included the Affidavit of Misty-Haggard Belford (Doc. 20) ("Belford Affidavit") and a Business Records Certification by BPS Clerk Pam Escobar (Docs. 21-26) as exhibits. The Belford Affidavit described in detail the public comments and events that took place at the Board meetings occurring between January 19, 2021 and October 26, 2021. (*See* Doc. 20.) The Business Records Certification included the meeting minutes and public comment forms for each of these Board meetings and copies of the Policy, and attested to the accuracy of the Board meeting videos. (*See* Docs. 21-26.)

6.     On January 24, 2022, the Court entered an Order denying the Motion for Preliminary Injunction. (Doc. 46.) In that Order, the Court found that the Policy is content- and viewpoint-neutral. (*Id.* at 5.) In addition, the Court determined that Plaintiffs are not likely to succeed in their as-applied challenge, finding that the "many hours of video reviewed" demonstrated that "the Policy was evenhandedly applied as a whole." (*Id.* at 7.) Finally, the Court determined that the Policy was neither overbroad nor vague. (*Id.* at 9-10.)[1]

7.     Furthermore, on December 20, 2021, Defendants filed a Motion to Dismiss the Complaint (Doc. 41), which the Court granted on July 12, 2022. (Doc. 63.) In its Order, the Court dismissed with prejudice Plaintiffs' facial

---

[1] Plaintiffs appealed the Order denying the Motion for Preliminary Injunction. (Doc. 47.) The appeal remains pending.

claims; all claims against Susin, McDougall, Campbell, and Jenkins; and the claims against Belford in her official capacity. (*Id.* at 10-11.) The Court dismissed Plaintiffs' as-applied and discriminatory access claims without prejudice. (*Id.* at 11.) Regarding the as-applied claims, the Court observed that on a motion to dismiss, it could not "weigh evidence and make a factual call" concerning whether "all interruptions of the Plaintiffs were based on violations of the Policy, not their viewpoint." (*Id.* at 8-9.) Still, the Court dismissed the as-applied and discriminatory access claims without prejudice due to the shotgun nature of the Complaint and Plaintiffs' failure to adequately allege an injury for purposes of establishing standing. (*See id.* at 3-4, 5-6.) Regarding these claims, the Court granted leave to Plaintiffs to "file an amended complaint addressing the deficiencies identified in this Order." (*Id.* at 11.)

8.     Plaintiffs filed their Amended Complaint against BPS and Belford on July 26, 2022, re-pleading only their as-applied claims. (Doc. 78.) Plaintiffs seek injunctive relief preventing the Policy from being applied against Plaintiffs and a declaration that the application of the Policy to Plaintiffs is unconstitutional.[2] (*Id.* at 25.) The Amended Complaint includes allegations regarding a new version of the Policy that was adopted in October 2021 and

---

[2] The relief requested in Plaintiffs' Amended Complaint, in which Plaintiffs seek an injunction fully barring the use of the Policy as to Plaintiffs, appears more appropriate for a facial claim rather than an as-applied claim.

Board meetings that occurred in 2022. (*Id.* at ¶¶ 11, 40-43.) These allegations exceed the scope and time period framed by the initial Complaint, as well as the instructions provided by the Court in the Order granting the Motion to Dismiss. Plaintiffs' deadline to seek leave to amend their Complaint passed on March 11, 2022, and the discovery deadline passed on July 29, 2022. (Doc. 11.)

9.     On August 9, 2022, Defendants filed a Motion to Strike Certain Allegations of Amended Complaint. (Doc. 82.) In it, Defendants argued that Plaintiffs exceeded the scope of the amendment permitted by the Court by injecting new factual issues into the case concerning meetings that occurred in 2022 after the filing of the Complaint, and by citing to the new version of the Policy,[3] rather than the version forming the subject of the initial Complaint. The Motion to Strike remains pending and is scheduled for hearing on September 7, 2022. (Doc. 89.)

10.     Also on August 9, 2022, Defendants filed an Answer and Affirmative Defenses (Doc. 81), in which Defendants responded to Plaintiffs' new factual allegations by referencing the Motion to Strike and reserving their arguments contained therein. (*Id.* at ¶¶ 11, 40-43.) Plaintiffs did not file a reply to Defendants' Answer and Affirmative Defenses.

---

[3] The new Policy does not change the language that Plaintiffs challenge in this action.

## Statement of Undisputed Material Facts

**A.      Board Meetings and the Public Participation Policy.**

1.      Belford is the Chair of the Brevard County School Board ("Board"). (Doc. 20 at ¶ 1.) As the Chair, Belford was present at and conducted each of the meetings described in Plaintiffs' Amended Complaint.[4] (*Id.* at ¶ 3.)

2.      The Board maintains School Board Policy 0169.1, entitled "Public Participation at Board Meetings" ("Policy"), which governs the manner in which Belford presides over public comments at Board meetings. (*Id.* at ¶ 11.)

3.      The Policy "does not prohibit the Board from maintaining orderly conduct or proper decorum in a public meeting." (*Id.* at ¶ 12.)

4.      Public comments at Board meetings are subject to several provisions of the Policy, including a requirement that the Chair "administer the rules of the Board" for the conduct of each Board meeting at which public participation is permitted. (*Id.* at ¶ 15.)

5.      The Policy also contains guidelines to the Board Chair, which provide that "all statements shall be directed to the presiding officer; no person may address or question Board members individually." (*Id.* at ¶ 16.)

6.      If an individual fails to follow the Policy, the Policy allows the

---

[4] While Defendants contend that the Court should strike allegations concerning 2022 meetings as beyond the scope of the amendment permitted by the Court, (Doc. 82), there is no dispute that Belford presided over all the meetings described in the Amended Complaint.

Chair to: (1) interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant; (2) request any individual to leave the meeting when that person does not observe reasonable decorum; (3) request the assistance of law enforcement officers in the removal of a disorderly person when that person's conduct interferes with the orderly progress of the meeting; and (4) call for a recess or an adjournment to another time when the lack of public decorum so interferes with the orderly conduct of the meeting as to warrant such action. (*Id.* at ¶ 17.)

7.     Belford begins each public comments section of the Board's meetings by reviewing the Policy with the audience. This includes reminding the audience that "reasonable decorum is expected at all times, and your statements should be directed toward the Board's chairman. The chairman may interrupt, warn, or terminate a participant's statement when time is up, it's personally directed, abusive, obscene, or irrelevant. Should an individual not observe proper etiquette, the chairman may request the individual leave the meeting." Belford concludes the review of the Policy by asking the audience to "encourage an environment appropriate for our children, who may be present or watching from home." (*Id.* at ¶ 18.)

8.     The Policy seeks to ensure that public speakers have a chance to share their perspectives, regardless of their viewpoints, while preventing disruption or interference with the Board's ability to conduct its business. The

Policy is also aimed at maintaining decorum and avoiding the incitement of other audience members in a manner that would create an unsafe situation or one that may adversely impact children. There are often children physically present at Board meetings, and other children observe Board meetings via livestream video or recorded video. (*Id.* at ¶ 22.) When Belford applies the Policy to public comments, her primary focus is on the expectation of decorum and the ability to maintain safety in the meetings. (Depo. Tr. excerpts of Misty Haggard-Belford, attached as **Exhibit A** ("Belford Tr."), at 185:10-15.)

9.     Similarly, the purpose of the provision requiring audience members to speak to the Board's Chair is to avoid disruption and unruliness in the Board meeting audience. The Board has observed that comments directed to individual Board members tend to result in audience members calling out and becoming disruptive, whether in agreement or disagreement with the speaker's comments. This precludes the Board from conducting its business and inhibits speakers from being heard. (Doc. 20 at ¶ 23.)

10.    Application of the Policy does not prevent speakers from making public comments based on their viewpoints. As demonstrated by the examples cited herein, the Policy is applied to all speakers, regardless of their position or point-of-view on an issue. (*Id.* at ¶ 24.)

## B.    Public Comments During Board Meetings

11.    The public comments section of Board meetings can be lengthy.

While the Policy provides that public comments shall be limited to 30 minutes, it allows the Board to vote to extend that timeframe, which the Board regularly does. (*Id.* at ¶ 18.) The Board does not limit the number of speakers who may sign up to make comments. (*Id.* at ¶ 8.) As a result, there have been meetings during which the Board heard from well over 100 speakers, such as the August 30, 2021 Board meeting, at which 142 speakers signed up. (*Id.*)

12.     On the rare occasion when a public speaker is asked to leave a meeting due to the disruption that the speaker is causing, the speaker is welcome to convey his or her comments to the Board via email, phone, or letter. The speaker may also return for subsequent Board meetings to express his or her viewpoints verbally so long as the speaker follows the established rules of decorum in accordance with the Board's Policy. (*Id.* at ¶ 21.)

13.     Board meetings are live-streamed and videos of the Board meetings are available online. (*See id.* at ¶ 10; Doc. 21 at ¶ 5.) The videos reflect that Belford, the Chair of the Board, rarely interrupts speakers, regardless of the viewpoint that they espouse. For instance, during the timeframe between January 19, 2021 and October 26, 2021, at least 34 individuals who identified themselves as MFL members spoke a total of 109 times at Board meetings, and Belford interrupted them only five times.[5] (Doc. 20 at ¶¶ 26-27.)

---

[5] Two of those occurrences were during the same set of public comments delivered by Cholewa. Viewed this way, the Chair only interrupted four sets of MFL public comments.

14. MFL members often criticize Board decisions and can be confrontational in tone. (*Id.* at ¶ 29.) However, unless MFL members—or any public speaker—violates the Policy, Belford does not interrupt them or otherwise intervene while they make their public comments. (*Id.*)

15. Uninterrupted comments by Plaintiffs include the following:

a. "You're failing our children. I know you all would like for us to just go away. But look at this room right now. We're not going away. We're here to stay, and we will continue to organize and fight for our rights that you have so easily taken from us. You all took an oath to uphold our Constitution. But you are falling short of that oath by instating mandates that violate our parental rights and our right to decide what is best, in the best interest of our child's health, mentally, physically, and otherwise." (Comment by Hall on February 9, 2021.) (*Id.* at ¶ 46.)

b. "Our freedoms are worth fighting for. And it starts with a yellow star on your chest. These masks are the yellow star on our chests. And I am not, not going to allow my children to be, to have to deal with this any longer." (Comment by Delaney on May 21, 2021.) (*Id.* at ¶ 125.)

c. "Again, this child is vaccinated, and she wore a mask. Your policy, and failure to implement or maintain it, has yet again failed another child. You all should be ashamed." (Comment by Delaney on September 9, 2021.) (*Id.* at ¶ 182.)

d.     "To the one Board member who is so worried about racial equity and inclusion as I stare up at a Board with zero racial diversity, I think it's time for her to lead by example, acknowledge her white privilege, put her money where her mouth is, and step down as a Board member to allow her position to be filled by a person of color." (Comment by Cholewa on September 9, 2021.) (*Id.* at ¶ 183.)

16.     As Board meeting videos and the excerpts included in the Belford Affidavit reflect, MFL members, including the individual Plaintiffs, frequently espoused viewpoints opposing mask mandates during the COVID-19 pandemic; favoring the "Parents' Bill of Rights"; opposing BPS implementation guidelines for an antidiscrimination policy addressing transgender students; and opposing the inclusion of critical race theory in curriculum. (*See, e.g.*, *id.* at ¶¶ 42, 44, 46, 50, 79, 80, 89, 101, 112, 114, 115, 119, 121, 125, 127, 129, 130, 132, 145, 152, 154-56, 159, 161, 170, 171, 173, 174, 179, 180, 182, 183, 185, 187-90, 193, 199, 200, 204, 205, 208, 209, 211-13, 215, 216, 218-20, 223, 224.) Except for the occasions identified by Plaintiffs, MFL members were not interrupted while speaking. (*Id.* at ¶ 231.)

17.     Many non-MFL members also espoused similar viewpoints without interruption. (*See, e.g.*, *id.* at ¶¶ 66, 67, 86-88, 90-92, 124, 151, 168, 177, 191, 192, 210, 214.)

18.     Interruptions of speakers, whether they are members of MFL or

not, are due to violations of the viewpoint-neutral Policy. (*Id.* at ¶¶ 226-30.) This includes interruptions of speakers with viewpoints that differed with those espoused by MFL. (*See, e.g.*, *id.* at ¶¶ 69, 74, 157, 158, 160, 162, 221.)

## C. Devolution of Decorum at Board Meetings

19.     Despite the neutral intended to maintain decorum (*id.* at ¶ 225), audience decorum devolved at Board meetings during the course of 2021. Audience members would call out, applaud, jeer, and heckle other public speakers and Board members. (*See, e.g.*, *id.* at ¶¶ 103, 110-113, 115, 147-49, 162; Belford Tr. at 48:2-49:2.)

20.     At the July 29, 2021 Board meeting, during comments by Board member Jennifer Jenkins, the audience became unruly and disruptive. (Doc. 20 at ¶ 147; Delaney Tr. at 23:11-23.) Law enforcement officers present at the meeting signaled to Belford that the Board should recess for its safety. (Doc. 20 at ¶ 147.) Belford therefore called a recess, during which audience members expressed a desire to "take over the meeting" and took control of microphones in the Board room. (*Id.* at ¶¶ 147-48; Delaney Tr. at 24:4-6.)

21.     At the next Board meeting, on August 10, 2021, Belford added references to § 877.13, Florida Statutes, to her opening remarks. (Doc. 20 at ¶ 165.) Section 877.13 provides that knowingly disrupting or interfering with the lawful administration or functions of a school board is a misdemeanor in the second degree publishable by 60 days in jail and a $500 fine. Belford added this

language to her opening remarks in collaboration with the Brevard County Sheriff's Office and BPS District staff. (*Id.*; Belford Tr. at 56:19-57:8.) The purpose of adding the language was to ensure decorum during meetings, prevent disruption or interference with the Board's ability to conduct business, and to ensure the safety of everyone at Board meetings. (Doc. 20 at ¶ 166.)

22.     Even with the inclusion of this new language in Belford's opening comments, audience members continued to shout and act disruptively during some public comments. (*See, e.g.*, *id.* at ¶¶ 169, 178, 195, 217.)

23.     Belford never asked law enforcement to arrest or prosecute anyone due to unruly conduct at Board meetings. (*See* Belford Tr. at 58:10-19.)

### D.     Comments by Plaintiff Ashley Hall

24.     Between January 19, 2021 and October 26, 2021, Plaintiff Ashley Hall spoke 13 times at Board meetings. (Doc. 20 at ¶ 30; Hall Depo. Tr., attached hereto as **Exhibit B** ("Hall Tr."), at 16:9-18:12.)

25.     Belford interrupted Hall once. That interruption occurred on February 23, 2021, when Hall began to thank Board member Susin regarding a topic, and Belford asked her "not to focus on individual board members, and keep it focused on the chair of the board as a whole." (Doc. 20 at ¶ 31; Hall Tr.

at 16:15-17, 19:10-15.)[6]

26.   The only alteration that Hall was sure she made to her public comments because of the Policy was refraining from using the specific names of Board members. (Hall Tr. at 18:25-19:4.) Hall also testified that she "probably" refrained from speaking about school library books, although she never attempted to make any public comments about books. (*Id.* at 19:5-9.)

### E.   Comments by Plaintiff Katie Delaney

27.   Between January 19, 2021 and October 26, 2021, Plaintiff Katie Delaney spoke 13 times at Board meetings. (Doc. 20 at ¶ 33; Delaney Depo. Tr., attached hereto as **Exhibit C** ("Delaney Tr."), at 12:12-23.)

28.   Delaney was never interrupted when she spoke at Board meetings. (Doc. 20 at ¶ 34.) Delaney herself could not recall any instances in which she was interrupted. (Delaney Tr. at 13:5-8.)

29.   During Board meetings, Delaney spoke repeatedly against mask mandates, critical race theory, and BPS' transgender-related guidelines. (*Id.* at 15:16-23, 16:5-8.)

30.   Delaney testified that she altered her public comments at Board meetings due to Belford's reference to § 877.13, Florida Statutes, in the opening

---

[6] Plaintiffs do not allege that any of the individual Plaintiffs were interrupted during the 2022 meetings that form the subject of the new factual allegations of the Amended Complaint and Defendants' Motion to Strike.

script for Board meetings; "public shaming" by members of the Board who commented on Delaney's statements; and "the behavior that the board has had outside of the boardroom." (*Id.* at 28:25-29:10.) Delaney did ***not*** attribute any alleged alterations in her public comments to Defendants' application of the Policy. (*See id.*)

## F.     Comments by Plaintiff Joseph Cholewa

31.     Between January 19, 2021 and October 26, 2021, Plaintiff Joseph Cholewa spoke 5 times at Board meetings. (Doc. 20 at ¶ 36; Depo. Tr. of Joseph Cholewa, attached hereto as **Exhibit D** ("Cholewa Tr."), at 16:3-9.)

32.     Belford interrupted Cholewa twice and asked him to leave once. (Cholewa Tr. at 21:1-10.) These interruptions and the request to leave the Board room were due to violations of the Policy, as Cholewa made comments that were personally-directed, abusive, and irrelevant. (Doc. 20 at ¶¶ 37, 119-23, 193-96; Cholewa Tr. at 21:23-22:2; Belford Tr. at 171:18-20, 172:2-16.) Furthermore, when Cholewa was asked to leave, he was not exhibiting the decorum required for the Board to continue with its business without impediment and was causing disruption in the audience. (Doc. 20 at ¶ 196; Belford Tr. at 167:10-18, 167:22-168:18, 171:4-20.)

33.     Cholewa describes "obscene" speech as "cursing, [or] pornographic" language. (Cholewa Tr. at 13:11-13.) He agrees that "cursing is inappropriate" at a Board meeting. (*Id.* at 28:25-29:11.) Cholewa understands "irrelevant" to

refer to comments that do not "pertain to issues that are school related." (*Id.* at 13:14-17.)

34.    Cholewa recognizes that public speakers should "follow the rules":

> [A]nybody should be able to speak on whatever they feel is important to them at the school board meeting. While if there are rules in place by the school board, that's the rules that – that they put in place. And, you know, I understand that you're supposed to follow the rules there. But my personal opinion is that I – people should be able to speak their mind *as long as it falls – does not – does not violate the rules of abusive or obscene or . . . irrelevant.*

(*Id.* at 30:20-31:10 (emphasis added).)

### G.    Plaintiff Amy Kneessy Never Spoke at Board Meetings

35.    Plaintiff Amy Kneessy never spoke or signed up to speak at any Board meetings. (Doc. 20 at ¶ 40; Depo. Tr. of Amy Kneessy, attached hereto as **Exhibit E** ("Kneessy Tr."), at 23:5-10.) In fact, Kneessy did not attend the Board meetings, and only watched them online. (*Id.* at 23:14-24:5.)

36.    Kneessy is a former member of the Board, and during the time that she served on the Board, the Policy at issue was revised to the version that was attached to Plaintiffs' Complaint. (*Id.* at 15:22-16:1.)

37.    Kneessy agrees that it is important to keep discussion during a school board meeting focused in order to allow the school board to conduct its business. (*Id.* at 38:15-18.) The only way to do this is to maintain decorum over a meeting. (*Id.* at 38:19-21.)

38.     Kneessy's purported concern in speaking at Board meetings is that she would be "stopped" in light of § 877.13, Florida Statutes, and that this would adversely affect her son's military security clearance. (*Id.* at 39:16-23.)

### H.     MFL Code of Conduct

39.     MFL utilizes a Code of Conduct, which Hall created. (Hall Tr. at 12:10-12.) The Code of Conduct states that "Moms for Liberty – Brevard County, Florida is committed to conducting our organization in a way that is free from abusive, offensive, or harassing behavior." (Hall Tr. Ex. 1 at 1.) Members may be (and have been) removed from MFL for violating the Code of Conduct. (Hall Tr. at 14:19-15:3, 33:3-8; Hall Tr. Ex. 1 at 4.)

40.     To Hall, the terms "abusive, offensive, or harassing" mean that MFL members should "make sure that we are respectful; we are not using terms that will be inflammatory. And then we also don't want to harass anyone. We are not going to try to provoke anyone." (Hall. Tr. at 12:24-13:7.)

### Argument and Incorporated Memorandum of Law

Summary judgment for Defendants is proper because the undisputed facts demonstrate that (1) Defendants do not apply the Policy in a manner that discriminates against Plaintiffs based on their viewpoints, and (2) Plaintiffs lack standing. *See* Fed. R. Civ. P. 56(a).

### A.     The Policy is Not Unconstitutional as Applied.

As the Court already determined after watching "many hours" of Board

meeting videos, "the Policy was evenhandedly applied as a whole." (Doc. 46 at 7.) Defendants do not apply the Policy in a manner that discriminates against speakers' viewpoints. The minimal instances when Belford applied the Policy to interrupt Plaintiffs' public comments were due to violations of the Policy and not due to the viewpoints espoused by Plaintiffs. Belford applied the Policy in an effort to maintain decorum in Board meetings, not to target speakers based on viewpoint. (Belford Tr. at 185:10-15, 186:18-187:8.)

The Policy requires speakers to direct comments to the Board Chair, and on two of the occasions when Plaintiffs' public comments were interrupted (*i.e.*, Hall's February 23, 2021 comments and Cholewa's May 21, 2021 comments), Plaintiffs directed comments to specific Board members. (Doc. 20 at ¶¶ 50-52, 119-23.) Other individuals who were not MFL members, and who espoused viewpoints opposing those expressed by Plaintiffs, were also interrupted for not addressing the Board Chair. (*Id.* at ¶¶ 74, 157, 158, 160, 162, 221.)

On the other occasion when the Chair interrupted Cholewa and eventually asked him to leave the meeting, his comments were abusive and caused disruption in the audience. (*Id.* at ¶¶ 193-96.) Other speakers who expressed similar viewpoints but did not do so in a manner that was abusive and did not negatively impact the decorum of the meeting spoke without interruption. (*See, e.g.*, *id.* at ¶ 187-88, 192, 197.) On the other hand, the Chair interrupted speakers who expressed viewpoints that differed with Cholewa's

but who similarly caused disruption or violated the Policy by expressing their views in an abusive manner. (*See id.* at ¶¶ 157, 162.)

Plaintiffs also point to Belford's interruption of an MFL member who attempted to read from a book purportedly available in school libraries, which the MFL member argued was inappropriate for children. Although the MFL member felt that the book should not be available to children due to sexual content, she attempted to read from the book during a live-streamed Board meeting, at which Belford reminded speakers that children may be present or watching. Belford interrupted the speaker, who was reading a passage from the book rather than expressing an opinion, due to the Policy's limits on obscene content.[7] (Belford Tr. at 180:3-23.) Belford also interrupted other speakers who expressed views contrary to those espoused by MFL members when those speakers utilized obscene language. (*See, e.g.*, Doc. 20 at ¶ 69.)

Perhaps most notably, the videos of the Board meetings at issue demonstrate that the majority of public commenters at Board meetings— whether MFL members or not—are critical of Board policies and/or Board members. However, they are not interrupted unless they violate the Policy. The videos also reflect multiple occasions on which individuals who expressed opinions ***opposite*** to those of Plaintiffs ***were*** interrupted under the Policy.

---

[7] Belford also interrupted the speaker due to FCC guidelines because Board meetings are broadcast on television. (Belford Tr. at 180:3-17.)

Defendants applied the Policy to prevent disruption to the Board's ability to conduct its business, rather than to chill the expression of viewpoints. The application of a neutral policy to prevent disruption to a school board meeting is not a constitutional violation. *See Dyer v. Atlanta Indep. Sch. Sys.*, 852 Fed. Appx. 397, 402 (11th Cir. 2021), *cert. denied*, 142 S.Ct. 484 (2021) ("*Dyer II*"), ("AISS did not regulate Dyer's speech based on its content, *i.e.*, because it was offensive. Rather, AISS regulated Dyer's offensive speech ***because it was disruptive***.") (emphasis added).

Like the plaintiff in *Dyer*, Plaintiffs have repeatedly addressed the Board uninterrupted when their comments do not violate the Policy and disrupt Board meetings. *See Dyer v. Atlanta Indep. Sch. Sys.*, 426 F. Supp. 3d 1350, 1359-60 (N.D. Ga. 2019) ("*Dyer I*") ("Here, APS officials were not regulating Dyer's speech because they were offended by and attempting to silence his criticism of APS. Other attendees had previously expressed criticism of APS without incident. Dyer himself before and since the incidents in question—has been allowed to freely criticize APS policy decisions and board members when he has done so without the use of racial slurs."). This reflects that Defendants did not apply the Policy to discriminate against Plaintiffs based on their viewpoints, which Plaintiffs repeated each time they spoke to the Board, typically without interruption.

Application of the Policy was also narrowly tailored. *See Jones v.*

*Heyman*, 888 F.2d 1328, 1333 (11th Cir. 1989) (actions taken to avoid disruption to government meetings must be "narrowly tailored to achieve this interest"). MFL members were interrupted due to violations of the Policy on very few occasions. Typically, these interruptions were brief, speaking time was not taken away from the speakers, and the speakers were able to continue their comments without further interruption. On only one occasion, when Cholewa was asked to leave, did matters escalate past such a brief interruption. This was due to the continued disruption that Cholewa caused to the meeting. Such an application of the Policy is constitutional. *See Brown v. City of Jacksonville, Fla.*, No. 3:06-CV-122-J-20MMH, 2006 WL 385085, at *3-*4 (M.D. Fla. Feb. 17, 2006).

Finally, even an occasional error in implementing the Policy does not rise to the level of a constitutional violation. *See Jones*, 888 F.2d at 1334 (presiding officers must make "judgment call[s] . . . without the benefit of leisure[ly] reflection," and "[a]n erroneous judgment call on the part of a presiding officer does not automatically give rise to liability for a constitutional tort"). Even if Plaintiffs point to a few inconsistencies during the many hours that the Policy was applied, such errors were not specific to Plaintiffs or their viewpoints.

The evidence reflects that Defendants did not apply the Policy in a manner that discriminated against Plaintiffs based on their viewpoint. Any occasional error by Belford as the presiding officer at Board meetings does not

give rise to constitutional error, particularly where Plaintiffs were able to deliver their public comments without interruption on the vast majority of instances. The Court should therefore enter summary judgment in favor of Defendants and against Plaintiffs.

### B.   **Plaintiffs Lack Standing.**

To the extent that Plaintiffs base their claims on the alleged "chilling" effect of the Policy, Plaintiffs cannot establish standing.[8]

Where a government restriction is alleged to produce a "chilling effect" on First Amendment rights, the chilling effect must constitute self-censorship to avoid a real threat of enforcement consequences in order to satisfy the actual injury requirement of standing. *See Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir. 2001). This requires a plaintiff to show "an intention to engage in a course of conduct arguably affected with a constitutional interest," but prohibited, and that there is a credible threat of enforcement consequences as a result of engaging in that conduct. *Id.* "A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir. 1998). For injury to be imminent, "the anticipated injury [must] occur within some fixed period of time

---

[8] Plaintiffs also lack standing to invoke alleged injuries to third parties as grounds for their claims. *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1178 n.4 (11th Cir. 2009).

in the future," and "not too far off." *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.,* 557 F.3d 1177, 1193–94 (11th Cir. 2009).

Plaintiffs claim that the Policy "chills" their speech, yet describe multiple occasions when Hall, Delaney, and Cholewa addressed the Board under that same Policy. Hall testified that the only alteration she made to her public comments due to the Policy was refraining from using the names of individual Board members.[9] (Hall Tr. at 18:25-19:4.) She spoke 13 times between January 19, 2021 and October 26, 2021, with 10 such occasions being after the sole interruption of her comments. When Hall was interrupted for directing her comments to Board member Susin, she was not fined, removed, or prosecuted.

Delaney testified that she made unspecified alterations to her public comments due to Belford's references to § 877.13, Florida Statutes; Board member responses to her comments; and Board members' behavior "outside of the boardroom." (Delaney Tr. at 28:25-29:10.) Delaney did not point to the Policy as a reason for changing her comments, which she made 13 times.

Cholewa testified that speakers should be able to say whatever they wanted ***within the confines of the Policy***. (Cholewa Tr. at 30:20-31:10.) His only purported fear under the Policy was that an interruption of his comments

---

[9] Hall also testified that she "probably" refrained from discussing school library books, even though another MFL member addressed books in her public comments without any type of prosecution. (Hall Tr. at 19:5-9; Doc. 20 at ¶¶ 219-20.)

would break his concentration. (*Id.* at 41:16-24.)

Kneessy claims that a fear of being arrested or trespassed for speaking, and thus possibly adversely affecting her son's security clearance, "chills" her speech. (Kneessy Tr. at 39:16-23.) This is completely speculative and fails to state a cause of action. Furthermore, Belford has not asked law enforcement to arrest or trespass speakers.

Plaintiffs fail to describe any "enforcement consequences" to which they would be subject under the Policy. Instead, Plaintiffs claim that references to § 877.13, Florida Statutes, at the start of Board meetings chills their speech. Plaintiffs lack support for that conclusion. Plaintiffs do not challenge the constitutionality of § 877.13, nor can they. *See O.P-G. v. State*, 290 So. 3d 950, 959 (Fla. 3d DCA 2019). Unless Plaintiffs intend to engage in speech that will disrupt a Board meeting (which they do not allege), Plaintiffs do not have an objectively reasonable fear of enforcement. *See id.* ("[T]he regulation punishes only that speech generating disruption, not speech merely intending to effect an impact."). And even if Plaintiffs did intend to engage in such speech, they have witnessed other public speakers engage in disruptions at Board meetings time and again without being fined or arrested. (*See* Belford Tr. at 58:10-19.) Finally, the inclusion of a reference to § 877.13, Florida Statutes, in the opening script for Board meetings does not relate to Defendants' application of the ***Policy***. If Defendants fear prosecution under § 877.13 because they wish

to disrupt a Board meeting, their dispute is with Florida's Legislature, not Defendants.

Additionally, MFL's Code of Conduct restricts MFL members from engaging in behavior that is "abusive, offensive, or harassing." (Hall Tr. Ex. 1 at 1.) Violations of the MFL Code of Conduct can result (and have resulted) in removal of members from MFL. (Hall Tr. at 14:19-15:3, 33:3-8.) To ensure membership in MFL, Plaintiffs cannot engage in the very type of behavior that the Policy guidelines also address. Plaintiffs cannot reasonably claim that they have an objective fear of prosecution for violating the Policy. They voluntarily agreed to abide by a Code of Conduct that in and of itself requires MFL members to act in a way that is in compliance with the Policy. (*See* Kneessy Tr. at 30:21-25; Hall Tr. at 11:23-13:24; Cholewa Tr. at 15:22-16:2.)

Therefore, insofar as Plaintiffs base their claims on the "chilling" effect of the Policy or the reference to § 877.13, Plaintiffs lack standing. The Court should enter summary judgment in favor of Defendants and against Plaintiffs.

## Conclusion

For all the reasons stated above, the Court should enter summary judgment for Defendants and against Plaintiffs.

WHEREFORE, Defendants respectfully request that the Court grant summary judgment in favor of Defendants and against Plaintiffs, and provide any other and further relief that the Court deems necessary and proper.

Respectfully submitted this 1st day of September, 2022.

/s/ Gennifer L. Bridges
HOWARD S. MARKS
Florida Bar No.: 0750085
Email: hmarks@burr.com
Secondary Email: echaves@burr.com
GENNIFER L. BRIDGES
Florida Bar No.: 0072333
Email: gbridges@burr.com
Secondary Email: nwmosley@burr.com
SHEENA A. THAKRAR
Florida Bar No.  871141
Email: sthakrar@burr.com
Secondary Email: echaves@burr.com
BURR & FORMAN LLP
200 S. Orange Avenue, Suite 800
Orlando, Florida 32801
Tel: (407) 540-6600
Fax: (407) 540-6601
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of September, 2022, a true and correct copy of the foregoing was filed via the CM/ECF system, which will provide electronic notice to the following counsel of record:

David Osborne (dosborne@goldsteinlp.com)
Goldstein Law Partners, LLC
4651 Salisbury Rd., Suite 400, Jacksonville, FL 32256

Ryan Morrison (rmorrison@ifs.org)
Martha Astor (astorm@ifs.org)
Institute for Free Speech
1150 Connecticut Ave., NW, Suite 801, Washington, DC 20036

/s/ Gennifer L. Bridges
Gennifer L. Bridges (FBN 0072333)