UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MOMS FOR LIBERTY – BREVARD COUNTY, FL, et. al, <br><br> *Plaintiffs*, <br><br> v. <br><br> BREVARD PUBLIC SCHOOLS, et. al, <br><br> *Defendants*. | Case No. 6:21-cv-1849-RBD-DAB <br><br><br> PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

STATEMENT OF UNDISPUTED MATERIAL FACTS

A. The Board's Public Speaking Policy.

Brevard Public Schools ("BPS"), Brevard County, Florida's public school district, is administered by an elected board. Fla. Stat. §§ 1001.35, 1001.42. The Board meets regularly and schedules a public comment period for each meeting so that "[m]embers of the public [are] given a reasonable opportunity to be heard on a proposition before the Board." Public Participation at Board Meetings, Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1 (the "Policy").

All speakers must direct their comments "to the presiding officer; no person may address or question Board members individually." *Id*. The presiding officer may "interrupt, warn, or terminate a participant's statement

when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant." *Id*. The presiding officer may expel anyone that "does not observe reasonable decorum," and ask law enforcement to remove "disorderly" people. *Id*. Approximately three law enforcement officers attend each meeting. Ex. 1, Belford Dep. at 39:18-24, 40:20-41:2. Defendant Misty Haggard-Belford ("Belford") is the Board chair. *Id*. at 12:4-9.

B. Plaintiffs

Plaintiff Moms for Liberty – Brevard County, FL ("M4L") is the Brevard County, Florida chapter of Moms for Liberty, a nonprofit organization that advocates for parental rights at all levels of government. *See* Ex. 2 Hall Dep. 7:7-21. Plaintiff Ashley Hall is a M4L member and was the chapter Chair from its inception until July 2022. *See* Doc. 3-2 at 2; Ex. 2 at 10:11-12. Plaintiff Katie Delaney was a M4L member until March 2022. *See* Ex. 3 Delaney Dep. 9:12-18. Plaintiff Joseph Cholewa is a M4L member. *See* Ex. 4 Cholewa Dep. 10:5-7. Plaintiff Amy Kneessy is a M4L member. *See* Ex. 5 Kneessy Dep. at 9:6-8, 9:12-14.

C. Censorship at Defendants' meetings.

1. *Censorship of "personally directed," "abusive," or "obscene" statements.*

Defendants' Policy purportedly prohibits speech that is "personally directed," "abusive," or "obscene" to allegedly maintain meeting decorum. But

the Policy does not define these terms and each board member defines them differently than Belford. *Compare* Ex. 1 at 151:19-158:10 *with* Ex. 6 McDougall Dep. at 11:3-6, 38:7-41:21; Ex. 7 Campbell Dep. at 12:6-15, 41:19-43:7; Ex. 8 Susin Dep. at 13:7-23, 59:9-62:5, 65:18-23, 67:1-21; Ex. 9 Jenkins Dep. at 10:12-19, 53:21-54:14, 55:11-24.[1] As chair, Belford enforces the Policy, but any member could potentially be the presiding officer. *See* Presiding Officer, Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0163.

Belford once deemed a speaker's comments to be personally directed and interrupted him when he said BPS's policies were part of the "evil LGBTQ agenda." Ex. 1 at 159:2-160:13; Doc. 3-3 at 1, March 23, 2021 meeting, https://bit.ly/3oT6DY4, Item E, Part 2 of 2 at 13:30-15:17. When he asked, "Is there a problem with the word 'evil?'", Belford replied, "Yes sir. You are calling a group of people evil and the policy evil." *Id.*

Belford censored another speaker for personally directed comments after she referred to a policy's advocates as the "liberal left." *See* Doc. 3-1 at 1 March 9, 2021 meeting, https://bit.ly/3p1I8YO, Item E part 1 of 2 at 9:34-

---

[1] Belford requires a speaker to disclose private personal information of an absent person for a statement to be personally directed. Ex. 1 at 153:11-155:3. The other board members do not. Belford could not define "abusive," but said it would include yelling, screaming, or profanity combined with negative words and a violation of another portion of the Policy. *Id.* at 156:17-157:20. The other board members provided either a different definition or none at all. Belford defines "obscene" as the use of profane language or speech that is inappropriate for young children. *Id.* at 157:21-158:10. The other board members define the term differently or not at all.

10:47. Belford ejected a woman from a meeting for making obscene comments after the speaker said "penis" during her criticism of BPS administrators for allowing an ex-teacher on campus that was convicted of indecent exposure. Ex. 10, 2d Kneessy Decl., April 26, 2022 Meeting, https://bit.ly/3aNKq96, Items M44&N45 at 13:18-14:25. Belford believed her language was not "appropriate." *Id*. And when a M4L member questioned the propriety of some elementary school library books by reading aloud from one of them, Belford cut her off because the language in the book was not "clean" and thus deemed obscene. *See* Ex. 1 at 179:19-180:23; Doc. 3-2 at 2, October 26, 2021 meeting, https://bit.ly/2ZsO2YF, Item E10 at 50:00-51:14. Later, Belford barred this M4L member from beginning her school library book criticism, saying "if it is not appropriate for children hear it, then I need you not to say it at the [meeting]." Ex. 10, May 10, 2022 Meeting, https://bit.ly/3PCCaYn, Item E9 at 5:30-7:20.

Plaintiff Cholewa expressed his dismay at Defendants' mask mandate for children, criticizing it as being in line with various policies allegedly endorsed by the Democratic Party, but Belford ejected him from the meeting before he could finish his remarks. *See* Doc. 3-4 at 1, 4-5; Sept. 21, 2021 meeting, https://bit.ly/3aEvDd2, Item E at 1:05-1:08. First, Belford interrupted Cholewa for criticizing the Democratic Party's alleged notion that babies are born racist, saying, "Joey, you're pushing the limit. Please be respectful." *Id.*

at 4. Cholewa continued, only to be interrupted again when, per Belford, he "insult[ed] half of [the] audience" by adding criticism of parents that help their children transition their gender to his litany of masking comparisons. *Id.* at 4-5. Belford deemed Cholewa's remarks personally directed at "individuals" that "aligned themselves with the Democratic Party" and that "they were obviously taking offense at the things that he was saying." Ex. 1 at 165:18-167:18, 170:19-21. She then abruptly ended Cholewa's speaking time, with approximately one minute remaining, and ordered him to leave the meeting after he questioned the Defendants' fidelity to First Amendment values. *See* Doc. 3-4 at 5.

> ### 2. *Prohibition on saying the names of school officials.*

The prohibition of "personally directed" statements prevents speakers from saying anyone's name, including the names of the elected board members or other BPS personnel. *See* Ex. 1 at 151:19-155:3; Ex. 11. Belford claims the prohibition is necessary to maintain safety at board meetings. Ex. 1 at 159:21-25, 161:2-24, 167:10-18; 171:18-20; 185:10-15. She is the only board member that believes the police have ever failed to control the crowd at the Board's facility. *Compare* Ex. 1 at 94:6-95:16 *with* Ex. 6 at 29:1-30:16; Ex. 7 at 39:8-40:19; Ex. 8 at 27:5-28:3; Ex. 9 at 47:19-49:6.

Belford silenced Plaintiff Cholewa when he criticized Defendants' COVID mask policies, and directed his comments to the board member that

represents his school district, Cheryl McDougall. *See* Doc. 3-4 at 2-4; Ex. 1 at 171:22-172:9. McDougall supported the mask policies, believes M4L is an "aggressive, nasty, and a hateful organization," has an unfavorable view of the Plaintiffs, and calls Cholewa, "Chihuahua." *See* Ex. 6 at 60:6-68:16.

Cholewa wanted to directly criticize McDougall, but Belford used the Policy to prevent his remarks. Belford interrupted Cholewa's speech, Ex. 1 at 172: 23-173:2, prompting him to ask, "So I can't talk about my representative from my district?" Doc. 3-4 at 2-3. Belford replied, "No you cannot." *Id.*

Likewise, Belford stopped Cholewa's remarks for being personally directed on another occasion when he criticized BPS's policies for being in line with the views of the Democratic Party. *See* Ex. 1 at 165:18-166:13; Doc. 3-4 at 1, 4-5; Sept. 21, 2021 meeting, https://bit.ly/3aEvDd2, Item E at 1:06:19-1:07:55.

Belford also prevented Plaintiff Hall, the chair of M4L at that time, from saying a board member's name. *See* Doc. 3-2 at 3. Wearing a M4L shirt, Hall attempted to thank a board member for his assistance in a school matter, but Belford interrupted her. *Id.*; Ex. 1 at 178:8-10; Ex. 11. She instructed that "[a]ny identification of any individual board member [is] prohibited." Ex. 11.

Belford applied the prohibition to other individuals criticizing the performance of the elected board members. Her policy application included stopping a speaker that criticized board member Jennifer Jenkins for providing Board supporters preferred access to a previous meeting to the

detriment of Board critics. *See* Doc. 3-3 at 1 March 23, 2021 meeting, https://bit.ly/3oT6DY4, Item E, Part 2 of 2 at 13:36-14:20. Belford censored a student criticizing Jenkins when she stated, "Jennifer Jenkins personally showed up to my school," and forced the student to continue her criticism by referring to Jenkins as "one board member," "this specific board member," and "this board member." Ex. 1 at 160:21-161:24; Doc. 3-2 at 1 April 13, 2021 meeting, https://bit.ly/3jBdUs0, Item E10 at 29:05-30:48. And another student was silenced when she called for the resignation of specific board members. Ex. 10, March 8, 2022 Meeting, https://bit.ly/3PnN0Sc, Items M&N at 1:00-2:10.

But Belford allowed an uncritical student to discuss Jenkins's presence at a school theatre rehearsal, *see* Doc. 3-2 at 1 Feb. 23, 2021 meeting, https://bit.ly/3ayunrX, Item E at 18:23-19:28, and another woman to offer effusive praise and support of Jenkins by name. *See* Doc. 3-2 at 2 October 26, 2021 meeting, https://bit.ly/2ZsO2YF, Item E10 at 53:34-56:42.

Other examples of Belford allowing speakers to mention individual board members and school personnel include:

- At the April 27, 2021 meeting, a man made multiple positive personally directed comments to board members and the BPS superintendent while acknowledging he was breaking the Policy before continuing to break the

Policy without any intervention from Belford. *See* Doc. 3-1 at 2, April 27, 2021 meeting, https://bit.ly/3pVknSP, Item E9 at 4:01-7:25.

- Speaker: "Dr. Mullins [BPS Superintendent] thank you so much for working with our community." *Id*., July 13, 2021 meeting, https://bit.ly/3BGafQP, Item E at 4:44-7:55.

- Speaker: "I've had the opportunity to meet and work with a few of Brevard's very capable leaders, Mrs. Bowman [BPS Director of Secondary Leading and Learning], a few members of the teaching staff, Dr. McKinnon [BPS Director of Equity and Diversity], Dr. Mullins, and I'm familiar with the work that they do. And I thank them for the leadership that they provide." *Id*. at 10:12-11:11.

- Speaker: "First, I'd like to thank Dr. Mullins for all you have done for our county." *Id*. at 21:10-21:30.

- Speaker: "First, Dr. Mullins thank you for your work, your service. The, uh, Board. And I am so encouraged by the statements that Ms. Jenkins made." *Id*. at 24:40-27:52.

- Speaker: "Thank you Dr. Mullins for your willingness to listen to the need of our community…." *Id*. at 28:04-28:44.

- Speaker: "Thank you Superintendent Mullins and Board." *Id*. at 30:36-33:10.

- Speaker: "To this Board, this hard working Board, Dr. Mullins, your staff, Dr. Sullivan [BPS Assistant Superintendent], Mrs. Cline [BPS Assistant Superintendent], and the like, I just want to say thank you for all that you continue to do for our students here in Brevard County." *Id*. at 33:35-34:02.

Belford admits she did a poor job enforcing the policy at the July 13, 2021 meeting. Ex. 1 at 173:3-174:10. She claims something distracted her during public comment. *Id*. at 174:1-5. However, neither Belford nor any of the other board members recall any unusual distractions during the meeting. *Id*. 174:1-10; Ex. 6 at 71:21-73:19; Ex. 7 at 48:2-10, 49:3-25; Ex. 8 at 83:1-12; Ex. 9 at 110:8-9, 111:21-112:2.

*3. Belford's prohibition on negative speech.*

Belford's definitions of "abusive" and "obscene" show she applies these prohibitions to only negative speech. Ex. 1 at 155:4-158:10. And she applies the prohibition on "personally directed" comments to prevent negative reactions from listeners. *Id*. at 159:21-25, 161:2-24, 166:2-167:18, 171:18-20.

D. Censorship and Chilling of Plaintiffs' Speech

M4L members and the Plaintiffs have either had the Policy enforced against them or seen the Policy enforced against likeminded individuals but not against Board-friendly speakers. Ex. 2 at 18:13-19:7; Ex. 3, at 13:16-25, 16:9-15, 27:1-28:13; Ex. 4 at 40:21-41:24; Ex. 5 at 23:5-24, 25:17-27:23, 29:3-

18, 38:3-14, 39:9-24, 40:6-14; Doc. 3-1; Doc. 3-2; Doc. 3-3; Doc. 3-4.
Consequently, Plaintiffs self-censor their comments or refrain from speaking
at all under the Policy. *Id.*

Plaintiffs desire to express their beliefs and opinions with particular
reference to individual board members, but are prevented by the Policy's
prohibition on "personally directed" comments. Ex. 2 at 18:23-19:7; Ex. 5 at
25:17-26:12, 38:3-14; Doc. 3-4 at 2-5. Plaintiffs also want to discuss whether
certain books are appropriate for school libraries or make other critical
comments, but they are prevented by Belford's interpretation of the Policy's
prohibition of "obscene" speech and FCC regulations. *See* Ex. 1 at 180:10-15;
Ex. 2 at 19:6-7; Ex. 4 at 40:21-41:24; Ex. 5 at 29:3-18. And because of
Belford's uncertain interpretation of "abusive" speech, Plaintiffs' critical
comments could be deemed as violating the Policy. Ex. 1 at 155:4-157:18; Ex.
4 at 40:21-41:24; Ex. 5 at 29:3-18.

Defendants also warn everyone at Board meetings that they could face
criminal prosecution if they "disrupt" the meeting under Fla. Stat. § 877.13.
*See* Doc. 3-1 at 3; Ex. 6 at 21:10-12, 28:4-13. Plaintiffs fear Belford will deem
their speech criminally disruptive; causing Plaintiffs to modify their speech
and, in Plaintiff Kneessy's case, to completely refrain from speaking. Ex. 5 at
23:5-24, 40:2-44:16; Doc. 3-1 at 2-3; Doc. 3-2 at 3-4; Doc. 3-3 at 1-2.

ARGUMENT

Plaintiffs are entitled to summary judgment, as "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendants' application of the policy terminates and chills Plaintiffs' speech on the basis of viewpoint, in violation of Plaintiffs' First Amendment rights.

I. THE FIRST AMENDMENT FORBIDS DEFENDANTS FROM DISCRIMINATING AGAINST SPEECH AT SCHOOL BOARD MEETINGS ON THE BASIS OF VIEWPOINT.

The public comment portion of a school board meeting is a limited public forum. *See Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 & n.7 (1983). While "a limited public forum may rightly limit speech at the forum to only certain content, the First Amendment does not tolerate viewpoint-based discrimination against speech within the scope of the forum's subject matter." *Barrett*, 872 F.3d at 1225 n.10. Government officials "cannot engage in bias, censorship or preference regarding [another] speaker's point of view." *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (internal quotation marks omitted).

Viewpoint discrimination is presumptively unconstitutional. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995). "[G]overnment must abstain from regulating speech when the specific

motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Otto*, 981 F.3d at 864 (quotation marks omitted).

Thus, Defendants cannot control the terms of the debate about gender or critical race theory, COVID restrictions, school library books, or any other school issue. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831. Defendants also cannot avoid criticism—which is a First Amendment-protected viewpoint.

## II. DEFENDANTS' POLICY APPLICATION CENSORS AND CHILLS PLAINTIFFS' SPEECH BASED ON THEIR VIEWPOINTS.

Defendants' application of the Policy to Plaintiffs and others, including Defendants' silencing of speech they deem to violate the Policy, and threats that Policy violations would trigger criminal prosecution, terminates Plaintiffs' speech and causes them to either self-censor their speech or avoid speaking altogether. *See* Facts § D *supra*. The Policy's prohibitions on "personally directed" and "abusive" speech, as-applied by Defendants, squelches and chills viewpoints that they dislike. Likewise, Defendants' application of the "obscene" speech prohibition differs markedly from any courts' understanding of that concept.

Apart from the plain fact that Defendants interrupt and prevent Plaintiffs' speech under the Policy, Plaintiffs "are being chilled from engaging in

constitutional activity [and] suffer a discrete harm independent of [the Policy's] enforcement." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (internal quotation marks omitted). It is irrelevant if some Plaintiffs continue speaking or if they occasionally avoid Policy enforcement when they speak because they are self-censoring. *See* Facts § D *supra*. When "the alleged danger of [the Policy] is one of self-censorship, harm can be realized even without an actual [enforcement]." *Speech First*, 32 F.4th at 1120. (internal quotation marks omitted). If "the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights"—then he suffers an unconstitutional chill of his free speech rights. *Id.* (internal quotation marks and citations omitted).

A. Plaintiffs' speech is protected.

    1. *Personally directed and abusive speech.*

Belford states she enforces the Policy prohibitions based on the reaction of listeners in the boardroom and to protect the sensibilities of children and those watching on television. Ex. 1 at 156:14-157:25, 159:21-25, 161:2-24, 167:10-18; 171:18-20; 185:10-15; 188:23-189:10. But "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself

offensive or disagreeable." *Otto,* 981 F.3d at 872 (quoting *Texas v. Johnson,* 491 U.S. 397, 414 (1989)). "The Supreme Court has reiterated time and again—and increasingly of late—the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend.'" *Speech First*, 32 F.4th at 1126 (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017)). "[A] law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (quoting *Tam*, 137 S. Ct. at 1751).

"'[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Tam*, 137 S. Ct. at 1763 (plurality opinion) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)) (collecting cases); *see Brunetti*, 139 S. Ct. at 2299, 2301.

Belford's admission that she enforces the Policy based on potential audience reactions proves Plaintiffs' case. If people become upset to the degree that they break the decorum of board a meeting because they do not appreciate a speaker's point of view, the fault lies with the listeners, not the speaker. "Listeners' reaction to speech is not a content-neutral basis for regulation," *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). "Speech cannot be … punished or banned, simply because it might offend a [crowd]." *Nationalist Movement*, 505 U.S. at 134-35. "Desirable as [the prevention of conflict] is, and important as is the preservation of the

-14-

public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." *Buchanan v. Warley*, 245 U.S. 60, 81 (1917). "'The danger of viewpoint discrimination … is all the greater if the ideas or perspectives [the government is attempting to remove] are ones a particular audience might think offensive, at least at first hearing.'" *Speech First*, 32 F.4th at 1127 (quoting *Tam*, 137 S. Ct. at 1767 (op. of Kennedy, J.)). Accordingly, a "heckler's veto is not to be tolerated." *Bledsoe v. City of Jacksonville Beach*, 20 F. Supp. 2d 1317, 1326 (M.D. Fla. 1998). The First Amendment requires Belford to ask offended listeners that break decorum to leave the room instead of censoring the speaker with the Policy.

Belford admits she enforces the Policy to keep meeting audience members from being offended and becoming upset, and her judgment of whether people are offended is very subjective. *See e.g.*, Ex. 1 at 166:2-167:18. And the record shows that the larger the audience or the more upset it gets, the more strictly she enforces the Policy. Ex. 8 at 87:3-24.

The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (citation omitted). The legal status of Plaintiffs' prohibited speech is not controversial. Simply put:

"abusive" and "personally directed" speech is constitutionally protected—even if it offends Defendants, or the audience. And "[a]mong the views that [Plaintiffs] have said they want to advocate are" personally directed criticisms to elected officials, *i.e.* the board members. *Speech First*, 32 F.4th at 1125. "Whatever the merits or demerits of those sorts of statements, they [ ] constitute 'core political speech,' with respect to which 'First Amendment protection is 'at its zenith.'" *Id.* (quoting *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999)).

Speakers like Plaintiff Cholewa cannot be stymied in their efforts to criticize BPS officials with a rule that reduces them to mention individuals only in obtuse, indirect ways, or forces speakers to refrain entirely from mentioning political actors during public debate. He attempted to criticize his elected public official that was responsible for a public policy that he opposed but Belford censored him. *See* Doc. 3-4 at 2-4; Ex. 1 at 172:23-173:2; Ex. 6 at 60:6-68:16. The First Amendment protects this political speech by securing his "ability to question the fitness of the community leaders, including the administrative leaders in a school system, especially in a forum created specifically to foster discussion about a community's school system." *Bach v. Sch. Bd. of Va. Beach*, 139 F. Supp. 2d 738, 743 (E.D. Va. 2001) (internal quotation marks and citation omitted). Barring personally directed comments to board members hinders rather than advances the proper functioning of a

school board meeting, and invariably impedes the expression of viewpoints critical of officials. Unsurprisingly, as applied by Defendants, the rule stops a great deal of critical speech, but relatively little praise.

And "as the Court made clear in *Tam*, a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Brunetti*, 139 S. Ct. at 2301 (quoting *Tam*, 137 S. Ct. at 1751) (citations omitted). Indeed, laws that "reflect[] the Government's disapproval of" speech "it finds offensive" is "the essence of viewpoint discrimination." *Id.* (quoting *Tam*, 137 S. Ct. at 1766 (op. of Kennedy, J.)) (quotation marks omitted).

"[T]he First Amendment has no carveout for controversial speech." *Otto*, 981 F.3d at 859. And while each *Tam* justice phrased the rule differently, both opinions agree that censoring speech because it is offensive is viewpoint discrimination. *Compare Tam*, 137 S. Ct. at 1763 (op. of Alito, J.) (censorship of offensive speech is viewpoint discrimination because "[g]iving offense is a viewpoint.") *with id.* at 1766 (op. of Kennedy, J.) ("The law [ ] reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination.").[2]  Therefore, enforcing speech

---

[2] In *Tam*, four justices joined both Justice Alito's and Justice Kennedy's opinion. 137 S. Ct. at 1751, 1765. Accordingly, *Marks v. United States*, 430 U.S. 188, 193 (1977), requires application of the opinions where they agree, on the narrowest grounds. *See Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1222 n.31 (11th Cir. 2020).

regulations that "bar" "disparagement," *e.g.*, personally directed, or abusive comments, discriminates against viewpoint. *Brunetti*, 139 S. Ct. at 2299.

    2. *Obscene speech.*

    "Obscene" speech is unprotected. However, Defendants use the obscenity prohibition to stop inconvenient or uncomfortable criticism. Surely Defendants agree that books in BPS libraries do not meet the definition of obscenity in *Miller v. California*, 413 U.S. 15, 24 (1973). But when M4L members read these books aloud, Defendants stop and admonish them to use "clean" language or do not allow them to begin reading at all. This censorship with the prohibition on using formal biological terms within criticism of BPS officials allowing a teacher convicted of indecent exposure to be on campus creates a chill on Plaintiffs' free speech rights.

    The speakers' references to sexual conduct or anatomy were not appealing to any prurient interest, but were stated to make a political or philosophical point. As such, they cannot be considered obscenity under *Miller*. And the mild profanity each speaker used is not a reason to censor them. Similarly, the asserted child protection interest is unavailing. The government may not "reduce the adult population . . . to [ ] only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). As-applied by Defendants, the Policy's ban on "obscene" speech is unconstitutional.

And Belford's claim that FCC regulations require the "obscenity" prohibition, *see* Ex. 1 at 180:3-17, 189:3-10, is wrong. Even if Plaintiffs' speech met the FCC's definitions of indecency and profanity, meetings air on cable. *See* School Board Meeting Videos, Brevard Public Schools, https://www. brevardschools.org/Page/2305. The FCC cannot regulate cable television like broadcast television. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 638-39 (1994). Indeed, FCC indecency and profanity regulations "do not apply to cable." FCC, *Obscene, Indecent and Profane Broadcasts* (www.fcc.gov/sites/ default/files/obscene_indecent_and_profane_broadcasts.pdf). And even if FCC regulations purported to bar Plaintiffs' speech, it would not change the fact that Defendants' application of the Policy violates Plaintiffs' First Amendment rights.

Plaintiffs are entitled to nominal damages to "redress [their] past injur[ies]" of having been unlawfully silenced by Defendants. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).

B. Reasonable fear of punishment.

Belford's application of the Policy creates a credible threat of enforcement. Plaintiffs reasonably fear Policy enforcement because of their own experiences and knowledge of enforcement on others. *See* Facts § D *supra*. They also fear the threat of criminal prosecution if they violate the Policy. *Id*.

"Neither formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights—indirect pressure may suffice." *Speech First*, 32 F.4th at 1123. Accordingly, it is irrelevant that Belford cannot enforce criminal law. "[A] defendant without [that] authority can also exert an impermissible type or degree of pressure." *Id*. (internal quotation marks and citation omitted). Due to the presence of law enforcement officers in the meeting room and her authority to order speakers exit the facility, Plaintiffs could reasonably believe Belford could retaliate against them with criminal sanctions if they do not comply with her directives. *See id*.

The Policy's "imprecision exacerbates its chilling effect." *Speech First*, 32 F.4th at 1121. Belford cannot define "abusive," *see* Ex. 1 at 155:4-157:6, has a vague understanding of "obscene," *id*. at 157:21-158:10, and applies the prohibition on "personally directed" comments beyond her own definition of the term. *Compare* 151:19-155:3 (defining the term as statements about named individuals) *with* 159:21-25, 160:8-13, 161:2-24, 166:2-167:18, 171:18-20 (applying the term to groups). Plaintiffs "should know what is required of them so they may act accordingly." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (quotation marks omitted). The lack of "precision" in Belford's understanding and application of the Policy to Plaintiffs demonstrates she is enforcing it "in an arbitrary or discriminatory way." *Id*.

Indeed, the lack of "objective, workable standards" allows Belford's "own politics [to] shape [her] views on what counts as [prohibited speech]," *id.*, including speech that offends Democrats. Ex. 1 at 165:18-167:1-18, 170:19-21.

Belford's understanding and application of the Policy to Plaintiffs is haphazard. *See* Facts § C 2 *supra*. Indeed, her inconsistent policy application is influenced by her inability to understand the Policy's purpose, her struggle to define its prohibited categories, and her very subjective interpretation of audience reactions to determine when meeting decorum is disturbed. Ex. 1 at 146:22-149:17, 151:19-158:10, 166:2-167:18. "The whim, self restraint, or even the well reasoned judgment of a government official cannot serve as the lone safeguard for First Amendment rights." *Fla. Cannabis Action Network, Inc. v. City of Jacksonville*, 130 F. Supp. 2d 1358, 1362 (M.D. Fla. 2001). "Although the First Amendment sometimes allows hurtful expression, that's a cost that 'We the People' have accepted as necessary to protect free-speech interests more generally." *Speech First*, 32 F.4th at 1128 (citation omitted).

And if Belford—"as one intimately familiar with [the Policy]"—and the rest of the Board cannot agree on what is a prohibited statement, "it seems eminently fair to conclude that [Plaintiffs] can't either." *Id.* at 1122. Accordingly, the Policy "fails to provide [Plaintiffs] with specific enough information to determine whether any particular statement is permitted or prohibited." *Id.* Consequently, "a reasonable [public speaker] could fear that

his speech would get him crossways with the [Defendants], and that he'd be better off just keeping his mouth shut." *Id*. The Policy's "operation causes a reasonable [public speaker] to fear expressing potentially unpopular beliefs." *Id*. at 1121. Plaintiffs are entitled to declaratory and injunctive relief.

IV.  EQUAL UNLAWFUL POLICY APPLICATION IS IRRELEVANT.

Whether Defendants equally apply the Policy to their supporters and Plaintiffs is irrelevant. Based on the record, *see* Facts § C *supra*, Belford almost always applies the Policy to negative comments, but not positive statements whether they are "personally directed," Ex. 1 at 159:21-25, 161:2-24, 166:2-167:18, 171:18-20, "abusive," *id*. at 155:4-157:18, or "obscene." *Id*. at 157:21-158:10. But "prohibit[ing] all sides" from using offensive speech "makes a law more viewpoint based, not less so." *Tam*, 137 S. Ct. at 1766 (op. of Kennedy, J.); *see Brunetti*, 139 S. Ct. at 2299, 2301. Prohibiting "speech that denigrates rather than validates" is viewpoint discrimination. *Speech First*, 32 F.4th at 1126-27 (citing *Brunetti*, 139 S. Ct. at 2299). Indeed, banning "negative comments" in a limited public forum is "invidious viewpoint discrimination." *Jenner v. Sch. Bd*., No. 22-cv-85, 2022 U.S. Dist. LEXIS 96930, at *15 (M.D. Fla. May 31, 2022) (citing *Tam*, 137 S. Ct. at 1763 (op. of Alito, J.)).

Nor does it help Defendants if they only occasionally engage in improper censorship. "[A] government actor can objectively chill speech—through its

implementation of a policy—even without formally sanctioning it." *Speech First*, 32 F.4th at 1122. "Punishment … is not uniformly necessary." *Id*. Accordingly, "allowing a viewpoint to be offered on some occasions without interruption does not prove the policy viewpoint neutral." *McBrearty v. Sch. Bd. of RSU22,* No. 22-cv-206, _ F. Supp. 3d _, 2022 U.S. Dist. LEXIS 128353 at *26 (D. Me. July 20, 2022) (internal quotation marks omitted).

V.   DEFENDANTS' CAN REGULATE BEHAVIOR TO MAINTAIN DECORUM, NOT SPEECH.

Defendants have an "interest in conducting orderly, efficient meetings." *Jones v. Heyman*, 888 F.2d 1328, 1332 (11th Cir. 1989). But "there is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct." *Otto*, 981 F.3d at 865. Offensive speech is not disruptive behavior.

In *Jones*, the plaintiff was ejected from a city commission hearing because of his "disruptive conduct and failure to adhere to the agenda item under discussion." 888 F.2d at 1332. The "disruptive conduct" consisted of Jones telling the mayor that he had a "problem" for requiring on-topic speech, followed by a threat to fight the mayor. *Id*.

In *Dyer v. Atlanta Indep. Sch. Sys.*, 852 F. App'x 397, 401 (11th Cir. 2021), the plaintiff's speech was constitutionally protected. *Id*. But his conduct,

-23-

including his refusal to leave the podium when instructed was not. *Id.* at 399. Indeed, he was suspended from attending meeting for his "disruptive and unruly behavior," not his offensive comments. *Id*. at 402.

The police are present at every meeting to maintain decorum. All board members but Belford believe they have always maintained order. *Compare* Ex. 1 at 94:6-95:16 *with* Ex. 6 at 29:1-18; Ex. 7 at 39:8-40:19; Ex. 8 at 27:5-28:3; Ex. 9 at 48:22-24. None of the speech that Defendants censor is accompanied by anything approaching the misconduct in *Jones* or *Dyer*. Accordingly, Belford applies the Policy to regulate Plaintiffs' viewpoints and chill their speech, not their behavior.

Defendants' purported commitment to maintaining meeting decorum and prohibiting "personally directed" statements for safety concerns strains credulity. If a meeting's safety is dependent on Belford's enforcement of the "personally directed" comment prohibition, then she would not have allowed any alleged distraction keep her from enforcing the rule against seven different speakers on July 13, 2021. *See* Facts § C 2 *supra*. Belford's true motive is to control viewpoints at her convenience, not maintain meeting decorum or safety.

VI. DEFENDANTS' POLICY APPLICATION VIOLATES PLAINTIFFS' PETITION RIGHTS.

"The right to petition the government for a redress of grievances is one of the most precious of the liberties safeguarded by the Bill of Rights."

*DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (internal punctuation marks and citations omitted). "A petition may consist of a personal grievance addressed to the government and may be an oral grievance." *Floyd v. Cty. of Miami-Dade*, No. 17-cv-21709, 2017 U.S. Dist. LEXIS 76631 at *9 (S.D. Fla. May 18, 2017) (internal quotation marks and citations omitted). And Petition Clause claims may be decided using Speech Clause analysis. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011); *Grigley v. City of Atlanta*, 136 F.3d 752, 754-55 (11th Cir. 1998).

Much if not most public comment at school board meetings qualifies as petitioning for redress of grievances. Accordingly, the analysis for Plaintiffs' speech claims also governs—and proves—their petition claims.

CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Dated: September 1, 2022          Respectfully submitted,

                                  /s/ Ryan Morrison
David Osborne                     Ryan Morrison (*pro hac vice*)
GOLDSTEIN LAW PARTNERS, LLC       INSTITUTE FOR FREE SPEECH
4651 Salisbury Rd., Suite 400     1150 Connecticut Ave., NW, Suite 801
Jacksonville, FL  32256           Washington, DC  20036
610-949-0444                      202-301-3300
dosborne@goldsteinlp.com          rmorrison@ifs.org

CERTIFICATE OF SERVICE

On September 1, 2022, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system, which will send a notice of electronic

filing to all attorneys of record.

/s/ Ryan Morrison
Ryan Morrison (*pro hac vice*)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, DC  20036
202-301-3300
rmorrison@ifs.org
*Lead Counsel for Plaintiffs*