UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MOMS FOR LIBERTY – BREVARD COUNTY, FL, et. al, <br><br> *Plaintiffs*, <br><br> v. <br><br> BREVARD PUBLIC SCHOOLS, et. al, <br><br> *Defendants*. | Case No. 6:21-cv-1849-RBD-DAB <br><br> PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

MATERIAL FACTS IN DISPUTE

Plaintiffs dispute the following factual assertions.

- Defendants assert that their application of the Policy is viewpoint neutral and that it and the reference to state criminal law are only used to maintain meeting decorum and prevent disruptions. *See* Doc. 90, Facts §, ¶¶:

  ¶ 8 "The Policy seeks to ensure that public speakers have a chance to share their perspectives, regardless of their viewpoints, while preventing disruption or interference with the Board's ability to conduct its business. The Policy is also aimed at maintaining decorum and avoiding the incitement of other audience members in a manner that would create an unsafe situation or one that may

adversely impact children. …. When Belford applies the Policy to public comments, her primary focus is on the expectation of decorum and the ability to maintain safety in the meetings."

¶ 9    "[T]he purpose of the provision requiring audience members to speak to the Board's Chair is to avoid disruption and unruliness in the Board meeting audience."

¶ 10   "Application of the Policy does not prevent speakers from making public comments based on their viewpoints. As demonstrated by the examples cited [in Doc. 90], the Policy is applied to all speakers, regardless of their position or point-of-view on an issue."

¶ 13   Belford "rarely interrupts speakers, regardless of the viewpoint that they espouse."

¶ 18   "Interruptions of [all] speakers, …, are due to violations of the viewpoint-neutral Policy."

¶ 21   "The purpose of adding the language [of § 877.13, Florida Statutes] was to ensure decorum during meetings, prevent disruption or interference with the Board's ability to conduct business, and to ensure the safety of everyone at Board meetings."

But Defendants use the Policy to discriminate against disfavored viewpoints, including Plaintiffs' viewpoints, but not against Board-friendly speakers. *See* Ex. 1, Hall Dep. at 18:13-19:7; Ex. 2, Delaney Dep. at 13:16-25,

16:9-15, 27:1-28:13; Ex. 3, Cholewa Dep. at 40:21-41:24; Ex. 4, Kneessy Dep. at 23:5-24, 25:17-27:23, 29:3-18, 38:3-14, 39:9-24, 40:6-14; Doc. 3-1; Doc. 3-2; Doc. 3-3; Doc. 3-4; *compare* Doc. 3-4 at 2-5; Feb. 23, 2021 meeting, https://bit.ly/3ayunrX, Item E at 23:00-23:40; March 9, 2021 meeting, https://bit.ly/3p1I8YO Item E, Part 1 of 2 at 0:09:42-0:10:45; March 23, 2021 meeting, https://bit.ly/3oT6DY4, Item E, Part 2 of 2 at 13:36-14:20; April 13, 2021 meeting, https://bit.ly/3jBdUs0, Item E10 at 29:05-30:48; October 26, 2021 meeting, https://bit.ly/3PnN0Sc, Items E10 at 50:00-51:14; March 8, 2022 meeting, https://bit.ly/3PnN0Sc, Items M&N at 1:00-2:10; April 26, 2022 meeting, https://bit.ly/3aNKq96, Items M44&N45 at 13:18-14:25; May 10, 2022 meeting, https://bit.ly/3PCCaYn, Item E9 at 5:30-7:20 *with* Feb. 23, 2021 meeting, https://bit.ly/3ayunrX, Item E at 18:23-19:28; April 27, 2021 meeting, https://bit.ly/3pVknSP, Item E9 at 4:01-7:25; July 13, 2021 meeting, https://bit.ly/3BGafQP, Item E at 4:44-7:55, 10:12-11:11, 21:10-21:30, 24:40-27:52, 30:36-33:10, 33:35-34:02; October 26, 2021 meeting, https://bit.ly/2ZsO2YF, Item E10 at 53:34-56:42.

And Defendants' application of the Policy causes Plaintiffs to self-censor their comments to avoid enforcement of the Policy and prosecution under § 877.13. *See* Ex. 1 at 18:19-22, 19:1-2; Doc. 3-2 at 5; Ex. 2 at 27: 18-28:11; Doc. 3-3 at 2; Ex. 3 at 41:4-24; Doc. 3-4 at 2-6; Ex. 4 at 23:5-24, 25:17-26:23, 29:3-18, 38:3-14, 39:9-40:12, 41:2-44:16; Doc. 3-1 at 2-3.

¶ 14   "[U]nless [Plaintiffs]—or any public speaker—violates the Policy,

      Belford does not interrupt them or otherwise intervene while they

      make their public comments."

Defendants' Policy application is haphazard. The other Board members

disagree with Belford's interpretation of the Policy. *Compare* Ex. 5, Belford

Dep. at 151:19-158:10 *with* Ex. 6, McDougall Dep. at 11:3-6, 38:7-41:21; Ex. 7,

Campbell Dep. at 12:6-15, 41:19-43:7; Ex. 8, Susin Dep. at 13:7-23, 59:9-62:5,

65:18-23, 67:1-21; Ex. 9, Jenkins Dep. at 10:12-19, 53:21-54:14, 55:11-24.

Consequently, a reasonable person may agree or disagree with Belford that a

public speaker has violated the Policy when she enforces it.

¶ 32   Belford's "interruptions [of Cholewa] and the request [for him] to leave

      the Board room were due to violations of the Policy, as [he] made

      comments that were personally-directed, abusive, and irrelevant.

      [W]hen Cholewa was asked to leave, he was not exhibiting the decorum

      required for the Board to continue with its business without

      impediment and was causing disruption in the audience."

Belford testified that she interrupted Cholewa *only* because he made

allegedly personally directed comments to Democrats, which were upsetting

them. *See* Ex. 5 at 165:18-167:1-18, 170:19-21. Cholewa did not break

decorum or cause a disruption at the meeting that Belford asked him to

leave. *See* Doc. 3-4 at 4-5; Sept. 21, 2021 meeting, https://bit.ly/3aEvDd2,

Item E at 1:05-1:08. But Belford contributed to the purported disruption upon which she based Cholewa's ejection. *See id.*; Ex. 5 at 168:19-169:7.

MATERIAL FACTS NOT IN DISPUTE

Two material facts, which are apparently undisputed by the parties, determine the case's outcome.

- As-applied by Defendants, the Policy prohibits Plaintiffs' viewpoints that Belford deems "personally directed," "abusive," or "obscene" because she believes these types of views are offensive to meeting audience members. *See* Doc. 90 at 6-8; Doc. 91 at 2-9.

- Defendants' application of the Policy causes Plaintiffs to self-censor their viewpoints so they are not censored, interrupted, ejected, or prosecuted for disrupting meetings. *See* Doc. 90 at 13-17; Doc. 91 at 9-10.

ARGUMENT

I. DEFENDANTS DO NOT UNDERSTAND VIEWPOINT DISCRIMINATION.

All parties agree that Defendants may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). However, the parties disagree on what constitutes viewpoint discrimination. Defendants' definition of viewpoint discrimination is too narrow. Their entire argument rests on the position that viewpoint discrimination *only* occurs when the government favors one speaker's point of view over another speaker's opinion. *See* Doc. 90, § A, 17-

22. They argue Plaintiffs have not suffered any viewpoint discrimination because the Policy is "evenhandedly applied as a whole" to all viewpoints. *Id*. at 18 (quotation marks omitted). Indeed, "viewpoint discrimination occurs when government allows one message while prohibiting the messages of those who can reasonably be expected to respond." *Rosenberger* 515 U.S. at 894. But the Supreme Court and the Eleventh Circuit believe viewpoint discrimination can take other forms.

The "assertion that no viewpoint discrimination occurs because the [Policy] discriminate[s] against an entire class of viewpoints [(*e.g.*, "personally directed" or "abusive" comments)] reflects an insupportable assumption that all debate is bipolar." *Rosenberger* 515 U.S. at 831. The Supreme Court's "understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas." *Id*. The exclusion of any view on an issue "is just as offensive to the First Amendment as exclusion of only one." *Id*. The argument "that debate is not skewed so long as [the Policy censors] multiple voices [ ] is simply wrong; the debate is skewed in multiple ways." *Id*. at 831-32.

Therefore, viewpoint discrimination also occurs when the government censors "'particular views taken by speakers on a subject.'" *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (quoting *Rosenberger* 515

U.S. at 829). Indeed, "discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger* 515 U.S. at 828.

"The Supreme Court has reiterated time and again—and increasingly of late—the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend.'" *Speech First*, 32 F.4th at 1126 (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017)). "[T]he First Amendment has no carveout for controversial speech." *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020). "[A] law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) (quoting *Tam*, 137 S. Ct. at 1751). Indeed, laws that "reflect[] the Government's disapproval of" speech "it finds offensive" is "the essence of viewpoint discrimination." *Id.* (quoting *Tam*, 137 S. Ct. at 1766 (op. of Kennedy, J.)) (quotation marks omitted).

Here, Belford admits she applies the Policy to "personally directed" and "abusive" comments because they are offensive. *See* Ex. 5 at 155:4-157:20, 159:21-25, 160:1-7, 161:2-24, 166:2-167:18, 171:18-20. She acknowledges that if the crowd in the meeting becomes offended, then she enforces the Policy. *Id.* at 159:21-25, 160:1-7, 161:2-24, 166:2-167:18, 171:18-20. And the record shows that the larger the crowd and the more offended it becomes, the more strictly she enforces the Policy. *See* Ex. 8 at 87:3-24. But "[l]isteners' reaction

to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). "Speech cannot be … punished or banned, simply because it might offend a [crowd]." *Id.* at 134-35.

"'The danger of viewpoint discrimination … is all the greater if the ideas or perspectives [the government is attempting to remove] are ones a particular audience might think offensive, at least at first hearing.'" *Speech First*, 32 F.4th at 1127 (quoting *Tam*, 137 S. Ct. at 1767 (op. of Kennedy, J.)). "[P]rohibit[ing] all sides" from using offensive speech "makes a law more viewpoint based, not less so." *Tam*, 137 S. Ct. at 1766 (op. of Kennedy, J.); *see Brunetti*, 139 S. Ct. at 2299, 2301. Forbidding "speech that denigrates rather than validates" is viewpoint discrimination. *Speech First*, 32 F.4th at 1126-27 (citing *Brunetti*, 139 S. Ct. at 2299). Indeed, banning "negative comments" in a limited public forum is "invidious viewpoint discrimination." *Jenner v. Sch. Bd.*, No. 22-cv-85, 2022 U.S. Dist. LEXIS 96930, at *15 (M.D. Fla. May 31, 2022) (citing *Tam*, 137 S. Ct. at 1763 (op. of Alito, J.)). Therefore, enforcing speech regulations that "bar" "disparagement," *e.g.*, personally directed, or abusive comments, discriminates against viewpoints. *Brunetti*, 139 S. Ct. at 2299.

Defendants' application of the prohibition on "obscene" speech fares no better. Belford defines "obscene" as the use of profane language or speech that is inappropriate for young children. *See* Ex. 5 at 157:21-158:10. However,

obscenity is speech "which, taken as a whole, appeal[s] to the prurient interest in sex, which portray[s] sexual conduct in a patently offensive way, and which, taken as a whole, do[es] not have serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973).

As applied by Defendants, the Policy's prohibition on "obscene" speech prohibits reading public school library books and from saying the formal biological term "penis" in reference to criticism of BSP officials that allowed a former teacher, convicted of indecent exposure of his penis, to be on school campus. *See* Doc. 91-10, April 26, 2022 Meeting, https://bit.ly/3aNKq96, Items M44&N45 at 13:18-14:25; Ex. 5 at 179:19-180:23; Doc. 3-2 at 2, October 26, 2021 meeting, https://bit.ly/2ZsO2YF, Item E10 at 50:00-51:14; Doc. 91-10, May 10, 2022 Meeting, https://bit.ly/3PCCaYn, Item E9 at 5:30-7:20. This application of the Policy does not come close to meeting the *Miller* test.

Board meetings concern the interests of children, but so do all government hearings. The government may not "reduce the adult population . . . to [ ] only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). "[Q]uarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence . . . is to burn the house to roast the pig." *Id*. "The level of discourse [in a government meeting] simply cannot be limited to that which would be suitable for a sandbox." *Bolger v. Youngs Drugs Prods. Corp*., 463 U.S. 60, 74 (1983).

Belford also claims FCC regulations require the Policy's censorship. But this is wrong too. *See* Doc. 91 at 19. As applied by Defendants, the Policy's ban on "obscene" speech is unconstitutional. Defendants claim they apply the Policy to speech "to prevent disruption" at Board meetings and cite *Dyer v. Atlanta Indep. Sch. Sys.*, 852 F. App'x 397 (11th Cir. 2021) for authority. Doc. 90 at 20. But Defendants conflate offensive speech with disruptive behavior.

"[T]here is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct." *Otto*, 981 F.3d at 865. Indeed, Offensive speech is not disruptive behavior. *Id*. Dyer was suspended from attending school board meeting for his "disruptive and unruly behavior," not his offensive comments. *Dyer*, 852 F. App'x at 402. Here, Defendants cite the "occasion when [Plaintiff] Cholewa was asked to leave [the Board meeting] because of his "disruption" of the meeting as a legal use of the Policy. Doc. 90 at 21. However, all Cholewa did was *speak*. *See* Doc. 3-4 at 1, 4-5; Sept. 21, 2021 meeting, https://bit.ly/3aEvDd2, Item E at 1:05-1:08. He *did* nothing approaching the misconduct in *Dyer*. *Id*. In fact, Belford contributed to the purported disruption that led to Cholewa's ejection. *See id*.; Ex. 5 at 168:19-169:7. Indeed, Belford admits she caused a breach in decorum. Ex. 5 at 168:19-169:7. The audience was

"yelling" because they "were upset with [her]" for "what [she] was saying to Mr. Cholewa." *Id.*

The police are present at every meeting to maintain decorum. Accordingly, Cholewa's ejection was unnecessary. Belford was applying the Policy to regulate speech she deemed offensive, not his behavior.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Otto,* 981 F.3d at 872 (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). Defendants claim they enforce the Policy to maintain meeting decorum. *See* Doc. 90 at 18. But their judgment of when decorum is breached depends on whether someone is offended, *see* Ex. 5 at 155:4-157:20, 159:21-25, 160:1-7, 161:2-24, 166:2-167:18, 171:18-20; Ex. 8 at 87:3-24, or on misuse of the obscenity prohibition. *See* discussion *supra.* "[W]hen the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power." *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975). At bottom, the First Amendment prohibits Defendants' application of the Policy.

## II. THE POLICY CHILLS PLAINTIFFS' SPEECH.

Defendants claim Plaintiffs lack an injury to establish standing because their speech is not "chilled." *See* Doc. 90 at 22-25. They are wrong.

First, Plaintiffs have standing to pursue their nominal damages claim, seeking redress for their past injuries of having been unlawfully silenced by Defendants. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

Furthermore, the Eleventh Circuit has "long emphasized that the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Speech First*, 32 F.4th at 1120 (internal punctuation marks omitted). "[S]pecifically," the Court "held that litigants who are being chilled from engaging in constitutional activity suffer a discrete harm independent of enforcement, and that harm creates the basis for [the Court's ] jurisdiction." *Id*. (internal punctuation marks omitted). "Therefore, … where the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual [enforcement]." *Id*. (internal punctuation marks omitted). "The fundamental question under [Eleventh Circuit] precedent—as well as under the precedent of other courts that have decided similar 'speech code' cases—is whether the challenged policy 'objectively chills' protected expression." *Id*.

"Accordingly, to determine whether a First Amendment plaintiff has standing, we [must] ask whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-

censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights." *Id.* (internal punctuation marks and citations omitted). "[T]he threat of formal discipline or punishment is relevant to the inquiry, but it is not decisive." *Id.* Indeed, "[n]either formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights—indirect pressure may suffice." *Id.* at 1123. "[A] [government official] without [ ] direct regulatory or decision making authority can also exert an impermissible type or degree of pressure." *Id.* (internal quotation marks and citation omitted).

Belford's "enforcement of the [ ] [P]olicy [ ] cause[s] [ ] reasonable would-be speaker[s]," like Plaintiffs, "to self-censor." *Id.* at 1120. Moms for Liberty ("M4L")[1] members and the Plaintiffs have either had the Policy enforced against them or seen the Policy enforced against likeminded individuals. *See* Ex. 1 at 18:13-19:7; Ex. 2 at 13:16-25, 16:9-15, 27:1-28:13; Ex. 3 at 40:21-41:24; Ex. 4 at 23:5-24, 25:17-27:23, 29:3-18, 38:3-14, 39:9-24, 40:6-14; Doc. 3-1; Doc. 3-2; Doc. 3-3; Doc. 3-4. Consequently, Plaintiffs self-censor their comments or refrain from speaking at all due to the Policy. *Id.*

---

[1] Citing *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1178 n.4 (11th Cir. 2009), Defendants assert Plaintiffs cannot "invoke alleged injuries to third parties as grounds for their claims." Doc. 90 at 22 n.8. But *Amnesty* provides only that "an organization may not bring suit on behalf of non-members," *id.*, and indeed, Plaintiff M4L's as-applied claims only seek relief for its members. However, Defendants' Policy application against others is instructive; it impacts Plaintiffs' understanding of the Policy and consequently, their behavior.

Plaintiff Hall explains that after the Policy was enforced against her, *see* Doc. 3-2 at 5, she "altered [her] speeches some to try to comply with the[] Policy." Ex. 1 at 18:19-22. She wants to say board members' names to specifically "address certain things that happened throughout the [school] year," and discuss the appropriateness of "books that are in the [school] libraries." *Id*. at 19:1-2. But she self-censors herself to comply with the Policy. *Id*. at 18:19-22; Doc. 3-2 at 5.

Plaintiff Delaney self-censored "what [she] was wanting to talk about" at a Board rule making workshop, when Belford "cut [] off" her comments. Ex. 2 at 27:18-28:8. "[B]ecause of the threats that [Belford] had made against [public speakers]," Delaney "didn't continue on with what [she] want[ed] to talk about." *Id*. at 28:9-11.

Plaintiff Cholewa self-censors because Defendants enforced the Policy against him multiple times. *See* Doc. 3-4 at 2-6; Ex. 3 at 41:22-24. "When [Belford] stopped [his] speeches," he started writing them like he was on "pins and needles," because he knew that he "had to be very selective with the words that [he] used to avoid being stopped." Ex. 3 at 41:4-8. Cholewa believed that he could not "just write what [he] want[ed] to write" for his speeches. *Id*. at 41:13-14. Thus, his "speeches did adjust based off the understanding that [Belford] would be selective and subjective on what she was determining to be abusive or obscene." *Id*. at 41:9-11. He self-censored to

"avoid being stopped in the middle of [his] speech" since the interruption "takes you off of your momentum, and it breaks your concentration," which makes it difficult to "get[] back on track" with your speech. *Id*. at 41:16-21. Indeed, Cholewa "caution[ed] [his] speech more because [he] knew [Belford] would be [ ] focused on trying to find ways to stop [him] from speaking." *Id*. at 41:22-24.

Plaintiff Kneessy self-censors the most because she decided to not speak at all to avoid Policy enforcement. *See* Ex. 4 at 23:5-24, 25:17-26:23, 29:3-18, 38:3-14, 39:9-40:12, 41:2-44:16; Doc. 3-1 at 2-3. She watches each Board meeting online. Ex. 4 at 23:19-24. But Kneessy wants to attend the meetings and "speak to [her] elected official, …, Jennifer Jenkins. And [she] want[s] to identify what it is [she is] not happy with, be able to call [Jenkins] by name, and what I think she needs to do differently." Ex. 4 at 26:5-10; Doc. 3-1 at 2-3. She wants to speak to Belford "by name" and tell her "what she needs to be doing differently." Ex. 4 at 26:8-10; Doc. 3-1 at 2-3. She "would personally call out a couple other school board members." Ex. 4 at 43:20-21; Doc. 3-1 at 2-3. "[She] want[s] to be able to talk about individual senior staff members, [and] programs that they're implementing." Ex. 4 at 26:10-12. And she wants to say all of this "in that boardroom and not worry about being [charged with trespassing after violating the Policy], being arrested, and being forced out of the room." *Id*. at 26:12-15.

Kneessy knows "organizations like Moms for Liberty [have] been called [ ] domestic terrorist[s]" by the national school board association in a letter to the U. S. Attorney General, and that Belford "does not care for [her]." *Id*. at 27:14-23, 42:19-22, 43:7-10. Kneessy believes Belford "would love the opportunity to see [her] ejected from a school board meeting" and "use the Policy against [her]" when she exercised her First Amendment rights to free speech and redress. *Id*. at 43:11-44:1. And she fears the consequences of making her desired comments not just because of Policy enforcement, but also for the impact of "get[ting] pulled out of [a] Board meeting" due to a Policy violation or "get[ting] arrested" could have on the standing of her son's military security clearance. *Id*. at 27:8-23, 39:13-23, 40:6-12, 41:11-14, 41:21-42:2, 42:9-25, 44:2-16.

Therefore, "the challenged policy 'objectively chills' protected expression." *Speech First*, 32 F.4th at 1120. As explained directly above, Plaintiffs have standing to claim an unconstitutional chill of their First Amendment rights because they reasonably self-censor their comments due to Defendants' "enforcement of the government policy." *Id*.

Defendants disagree. They claim Plaintiffs Hall, Delaney, and Cholewa are not chilled because they continue to speak at meetings. *See* Doc. 90 at 23. Defendants argue that Policy enforcement has forced Hall to "only" make small alterations to her speech. *Id*. Delaney allegedly made "alterations to

her public comments" because of board member behavior but not due to enforcement of the Policy. *Id*. And Policy enforcement against Cholewa will "only" interrupt his speech. *Id*. Defendants also argue that Plaintiff Kneessy's fear of Policy enforcement is "speculative." *Id*. at 24.

Defendants claim that "Plaintiffs fail to describe any 'enforcement consequences' to which they would be subject under the Policy." *Id*. They claim that Plaintiffs' chill is based only on fear of criminal prosecution under § 877.13. *Id*. And "[u]nless Plaintiffs intend to engage in speech that will disrupt a Board meeting [they] do not have an objectively reasonable fear of enforcement." *Id*. Defendants' arguments not only show they misunderstand Plaintiffs' claims, but also *Speech First*.

The Policy enforcement consequences that Plaintiffs fear is censorship of their First Amendment freedoms. The censorship they fear from Policy enforcement include alterations to their speech, being interrupted during their comments, and the knowledge that what they want to say is prohibited by the Policy. They have explained this in their Complaint (Doc. 1 at 2-4, 9-33), Amended Complaint, (Doc. 78 at 1-2, 7-25), Opposition to Defendants' Motion to Dismiss (Doc. 49 at 4-19), Motion for Preliminary Injunction (Doc. 3 at 1-2, 4-10, 12-23), Motion for Summary Judgment (Doc. 91 at 9-23, 25), and depositions. *See* discussion *supra*. Defendants enforce the Policy by interrupting speakers. *See* Doc. 90 at 11-12. Defendants' threat of criminal

prosecution under § 877.13 is just the icing on the First Amendment chilling cake of the Policy.

As explained *supra*, Plaintiffs fear censorship under the Policy for good reason. Defendants enforced the Policy to censor Hall and Cholewa and now they self-censor to comply with the Policy and avoid enforcement. Kneessy only wants to say what the Policy forbids—making Policy enforcement against her certain—thus she does not speak at all to avoid enforcement. And Delaney's knowledge "of the threats [of enforcement] that [Belford] had made against [public speakers]," Ex. 2 at 28:9-11, combined with the fact that Belford had cut her off, is enough to cause Delaney to self-censor and establish a First Amendment chill. *See Speech First*, 32 F.4th at 1123.

Furthermore, the challenged Policy provisions regulate speech, and Defendants believe the Policy exists to "prevent[] *disruption*" of the Board's meetings—granting them the authority to ask a speaker "to leave a meeting due to the *disruption* that the speaker is causing." Doc. 90 at 7-9 (emphasis added); *see also* the Policy § G(3) (2021) (recodified at § H(3)); Doc. 41 at 17-19, 21, 22 (*e.g.*, "The Policy is narrowly tailored to serve the Board's interest in maintaining decorum, preventing *disruptions*, and conducting efficient meetings;" "The Policy was applied to prevent *disruption* to the Board's ability to conduct its business…."; "Plaintiffs have repeatedly addressed the Board uninterrupted when their comments do not violate the Policy and

*disrupt* Board meetings." (emphasis added)). A reasonable person may believe that because Defendants use the Policy to prevent "disruptions," then a person who speaks in violation of the Policy risks being entangled in an arrest and criminal process under § 877.13, the statute aimed at actual meeting disruptions. It is immaterial if the criminal charges are dismissed—the process can be the punishment.

It is irrelevant, as Defendants assert, that no one has been criminally prosecuted. *See* Doc. 90 at 24. "[F]ormal punishment" under the Policy or § 877.13 is unnecessary "to exert an impermissible chill on First Amendment rights." *Speech First*, 32 F.th at 1123. It is also irrelevant that Belford lacks "the formal power to" enforce § 877.13, *id.*, or that the police have not enforced the law. "The whim, self restraint, or even the well reasoned judgment of a government official cannot serve as the lone safeguard for First Amendment rights." *Fla. Cannabis Action Network, Inc. v. City of Jacksonville*, 130 F. Supp. 2d 1358, 1362 (M.D. Fla. 2001). Under *Speech First*, Plaintiffs have established an objective First Amendment chill.

Finally, Defendants argue that because M4L's code of conduct requires its members to refrain from "abusive," "offensive," or "harassing" behavior, "Plaintiffs cannot reasonably claim they have an objective fear of prosecution for violating the Policy." Doc. 90 at 25. This argument is specious. Of course, Plaintiffs and Defendants have different understandings of these terms. Even

Belford disagrees with the other Board members on what the Policy's terms mean. *Compare* Ex. 5 at 151:19-158:10 *with* Ex. 6 at 11:3-6, 38:7-41:21; Ex. 7 at 12:6-15, 41:19-43:7; Ex. 8 at 13:7-23, 59:9-62:5, 65:18-23, 67:1-21; Ex. 9 at 10:12-19, 53:21-54:14, 55:11-24. If Plaintiffs believed their speech violated the M4L code of conduct, then they would not express it, let alone bring a lawsuit to preserve their right to express it. In any event, it is undisputed that Defendants believe Plaintiffs' speech violates *Defendants'* Policy. Defendants only purport to enforce their own Policy. Even if Plaintiffs disregard the M4L code of conduct, that has no bearing on how they are impacted by Defendants' enforcement of *their* Policy.

CONCLUSION

Defendants' motion for summary judgment should be denied.

Dated: September 22, 2022          Respectfully submitted,

                                   /s/ Ryan Morrison
David Osborne                      Ryan Morrison (*pro hac vice*)
GOLDSTEIN LAW PARTNERS, LLC        INSTITUTE FOR FREE SPEECH
4651 Salisbury Rd., Suite 400      1150 Connecticut Ave., NW, Suite 801
Jacksonville, FL  32256            Washington, DC  20036
610-949-0444                       202-301-3300
dosborne@goldsteinlp.com           rmorrison@ifs.org

CERTIFICATE OF SERVICE

On September 22, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

/s/ Ryan Morrison
Ryan Morrison (*pro hac vice*)
*Lead Counsel for Plaintiffs*